FILED
United States Court of Appeals
Tenth Circuit

December 15, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

OLD REPUBLIC INSURANCE
COMPANY,

      Plaintiff - Appellant,

v.

CONTINENTAL MOTORS, INC.,

      Defendant - Appellee.

No. 16-1408

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:16-CV-00046-JLK)**
_____

Michael L. Poindexter, The Law Offices of Michael L. Poindexter, Golden, Colorado, for
Plaintiff-Appellant.

Norman E. Waldrop, Jr., Armbrecht Jackson LLP, Mobile, Alabama (Sherri R. Ginger
and Benjamin Y. Ford, Armbrecht Jackson LLP, Mobile, Alabama; and Theresa R.
Warden and Jennifer L. Parker, Wheeler Trigg O'Donnell, Denver, Colorado, on the
brief), for Defendant-Appellee.
_____

Before **MATHESON**, **McKAY**, and **McHUGH**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

This appeal addresses whether the federal district court in Colorado may exercise

specific personal jurisdiction over out-of-state defendant Continental Motors, Inc., a

manufacturer of airplane engines, based upon its contacts with Colorado through its website. Continental Motors' website allows airplane repair businesses known as fixed-base operators ("FBOs") to obtain unlimited access to its online service manuals in exchange for an annual fee. Arapahoe Aero, a Colorado-based FBO participating in the program, accessed and consulted the manuals in servicing an airplane that contained engine components manufactured by Continental Motors. The airplane later crashed in Idaho on a flight from Colorado.

After the crash, Old Republic Insurance Company, the airplane's insurer, paid the owner for the property loss and filed a subrogation action against Continental Motors in Colorado federal district court, seeking reimbursement. Old Republic alleged that Continental Motors' online service manuals and bulletins contained defective information, thereby causing the crash. Continental Motors moved to dismiss the lawsuit for lack of personal jurisdiction, arguing that it did not purposely direct its activities at Colorado. In response, Old Republic contended that Continental Motors had targeted its website and online manuals toward Colorado residents, thereby subjecting itself to personal jurisdiction as to claims arising out of these contacts. Old Republic conceded that Continental Motors did not maintain sufficient contacts with Colorado to support jurisdiction for all purposes. The district court granted the motion to dismiss, ruling that it did not have specific jurisdiction over Continental Motors.

On appeal, Old Republic maintains that Continental Motors is subject to specific personal jurisdiction in the State of Colorado for purposes of this case. It bases its jurisdictional argument entirely on Continental Motors' contacts with Colorado through

2

its website and online manuals.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A. *Factual History*

The following facts, except where otherwise indicated, are drawn from the operative complaint and the written materials that Old Republic submitted to the district court in support of the court's jurisdiction over Continental Motors.  *See Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (on motion to dismiss for lack of personal jurisdiction, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits" (quotations omitted)); *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998) (a plaintiff may satisfy its prima facie burden by submitting an "affidavit or other written materials [containing] facts that if true would support jurisdiction over the defendant").

### 1.  **The Parties**

Plaintiff-Appellant Old Republic is an insurance company incorporated in Pennsylvania, with its principal place of business in Illinois.  Defendant-Appellee Continental Motors is an aircraft engine and parts manufacturer incorporated in Delaware, with its principal place of business in Alabama.  Arapahoe Aero, a Colorado corporation and FBO,[1] is not a party to this case.  Arapahoe Aero operates a repair

---

[1] An FBO is a commercial business that operates at an airport and provides aeronautical services, including aircraft maintenance, to the public.  *See* Aplt. Br. at vi.

3

station, certified by the Federal Aviation Administration ("FAA"), out of the Centennial Airport in Englewood, Colorado.

2. **The Aircraft Accident**

On January 9, 2014, an airplane insured by Old Republic (the "Aircraft") crashed in Idaho on a flight from Colorado. The Aircraft's engine contained magnetos[2] manufactured by Continental Motors and serviced by Arapahoe Aero in reliance on one of Continental Motors' online manuals and two bulletins. Because the service manual and bulletins allegedly provided inadequate instructions, Arapahoe Aero failed to properly inspect and replace the magnetos' nylon distributor gears when it serviced the Aircraft in September of 2009 and again in December of 2013. The gears later failed during the Aircraft's flight on January 9, 2014, resulting in the crash.

When the Aircraft crashed, it belonged to Nylund Imports, Inc. ("Nylund"), a Colorado corporation. Nylund kept the Aircraft at the Centennial Airport in Englewood, Colorado. After the crash, Old Republic paid Nylund a $329,500 settlement for the value of the Aircraft[3] and also incurred other expenses in mitigating damages. In exchange for this payment, Nylund assigned its rights and interest in the Aircraft, including claims for property damage, to Old Republic.

---

[2] Magnetos are "engine-driven electrical generator[s] adapted to produce impulses of high voltage for spark plugs that are used in the ignition systems of spark-ignition aircraft piston engines." Aplt. Br. at vi. In other words, they power the aircraft engine's spark plugs, which ignite the engine fuel.

[3] Due to damage resulting from the crash, the anticipated cost to repair the Aircraft exceeded its value.

3. **Continental Motors' FBO Services and Rewards Program**

Continental Motors offers the FBO Services and Rewards Program (the "FBO Program"), which it advertises on its website's FBO Program webpage. In the five-year period preceding the crash, 20 FBOs from Colorado—including Arapahoe Aero—participated in the FBO Program. Arapahoe Aero first enrolled in 1996.

Membership in the FBO Program, which in 1996 cost about $1,000 annually, now costs about $240 annually.[4] In addition to paying the fee, participating members of the FBO Program must agree to a set of terms and conditions imposed by Continental Motors ("FBO T&C"). The FBO T&C provides, among other things, that members must complete an online profile, which involves submitting their addresses. The FBO T&C also provides that Continental Motors "reserves the right to make changes or terminate [the FBO Program] at any time." App., Vol. I at 63.

At all relevant times, the FBO Program provided member FBOs with complete access to Continental Motors' online service manuals, some of which were also made available for free to the public.[5] Over time, Continental Motors has made more of its online service manuals free to the public. When Arapahoe Aero serviced the Aircraft in

---

[4] The record does not reveal the exact annual fee charged at the times when Arapahoe Aero serviced the Aircraft in 2009 and 2013, but we infer from the fee's apparent reduction over time that it was somewhere between $240 and $1,000, likely closer to the $240 end.

[5] FAA regulations require certified aircraft engine manufacturers, such as Continental Motors, to "furnish at least one set of complete [service manuals] to the owner of each [engine] upon its delivery" and to make the manuals "available to any other person required . . . to comply with [mandatory airworthiness standards]," such as Arapahoe Aero. 14 C.F.R. § 21.50(b).

5

September of 2009, online access to the particular manual it referenced (the "Manual") was still restricted to members of the FBO Program.[6] By the time Arapahoe Aero serviced the Aircraft in December of 2013, however, anyone could access the Manual online for free.[7] In contrast to its service manuals, Continental Motors' online service bulletins—including the ones relied on by Arapahoe Aero in servicing the Aircraft—were freely accessible to the public at all relevant times.

Besides unrestricted access to online service manuals, participating FBOs received additional benefits from enrolling in the FBO Program. First, Continental Motors listed participating FBOs on its FBO Locator webpage. App., Vol. I at 58 ("As a member your shop will be listed in the query locator on our website. Your customers will have the ability to search for FBO's . . . by Country, State, and City bringing more customers to your business.").[8] Second, Continental Motors allowed participating FBOs to send two representatives to a week-long training school at the Continental Motors factory in Mobile, Alabama. *Id.* Third, Continental Motors rewarded a participating FBO $500 for every one of its engines it installs. *Id.* Fourth, Continental Motors provided participating

---

[6] Carmen Woodham, Continental Motors' Controller, explained at her July 21, 2016 deposition that—at all relevant times—anyone could pay for individual online access to any of the restricted manuals without subscribing to the FBO Program. She did not specify how much this individual access generally cost.

[7] This fact, which Old Republic does not dispute, is taken from Ms. Woodham's affidavit dated September 12, 2016.

[8] The record contains a screenshot of Continental Motors' FBO Locator webpage listing Arapahoe Aero and 19 other Colorado FBOs. App., Vol. I at 61. The screenshot does not indicate the date on which this webpage was accessed.

FBOs with dedicated customer support. *Id.* ("Highly-trained technical staff located in our Global Customer Support Center are available to help you learn the system and will assist you with your service and maintenance needs as well. It's like having your own dedicated technical service representative at your facility.").

## B. *Procedural History*

Old Republic brought a subrogation action against Continental Motors in the U.S. District Court for the District of Colorado. Old Republic's amended complaint—the operative one here—sought damages for one claim of strict liability in tort based on the Aircraft's magnetos' allegedly defective design, manufacture, and instructions.

Continental Motors moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Following a period of jurisdictional discovery, but without conducting an evidentiary hearing, the district court granted the motion to dismiss. It held that Old Republic failed to show that Continental Motors purposely directed its "website or electronic information" specifically at the forum state of Colorado. *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 207 F. Supp. 3d 1213, 1215 (D. Colo. 2016). Apart from the website and online service manuals and bulletins, the court did not credit any other contacts between Continental Motors and Colorado alleged by Old Republic. *Id.* at 1215-16.

Old Republic filed a timely notice of appeal.

## II. **DISCUSSION**

We first discuss our standard of review and the constitutional requirements for exercising specific personal jurisdiction over an out-of-state defendant. We then analyze

whether Old Republic has made a prima facie showing that these requirements have been met as to Continental Motors. We begin and end our jurisdictional analysis at the first step—whether Continental Motors purposefully directed its activities at Colorado. To answer this question, we consider the contacts alleged by Old Republic under their appropriate legal frameworks, as presented below. Comparing our case to other specific jurisdiction cases involving similar contacts, we conclude that the record does not contain evidence sufficient to establish jurisdiction here. We therefore affirm because Old Republic has not met its burden.

A. *Standard of Review*

"We review de novo the district court's dismissal for lack of personal jurisdiction." *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999). "When, as in this case, a district court grants a motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *Id.* (quotations omitted).[9] "We resolve all factual disputes in favor of the plaintiff in determining whether plaintiff has made a prima facie showing." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1074 (10th Cir. 2004) (quotations omitted).

---

[9] The district court in *Soma Medical* likewise ruled on the defendant's motion after a period of limited jurisdictional discovery. 196 F.3d at 1295; *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) ("Where plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, the plaintiff's prima facie showing . . . must include an averment of facts that . . . would suffice to establish jurisdiction over the defendant [if credited]." (quotations omitted)).

8

B. *Legal Background*

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court. *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000); *see* Fed. R. Civ. P. 4(k)(1)(A). Colorado's long-arm statute, Colo. Rev. Stat. § 13-1-124, extends jurisdiction to the Constitution's full extent. *Benton*, 375 F.3d at 1075; *Mr. Steak, Inc. v. District Court*, 574 P.2d 95, 96 (Colo. 1978) (en banc). The personal jurisdiction analysis here is thus a single due process inquiry. *See Benton*, 375 F.3d at 1075.

Due process requires both that the defendant "purposefully established minimum contacts within the forum State" and that the "assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). Depending on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction. *See Intercon*, 205 F.3d at 1247; *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014).

1. **General Jurisdiction**

General personal jurisdiction means that a court may exercise jurisdiction over an out-of-state party for all purposes. *See Daimler*, 134 S. Ct. at 754. "A court may assert general jurisdiction over foreign . . . corporations to hear any and all claims against them

when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317). "Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." *Benton*, 375 F.3d at 1080 (quotations omitted). Old Republic does not contend that Continental Motors' Colorado contacts satisfy the general jurisdiction standard, so only specific jurisdiction is at issue in this appeal.

## 2. **Specific Jurisdiction**

Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with the forum state. *See Daimler*, 134 S. Ct. at 754. Even though a defendant's forum state contacts may not support general jurisdiction, they may still meet the less stringent standard for specific jurisdiction if sufficiently related to the cause of action. *See id.* Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 476-77; *Shrader v. Biddinger*, 633 F.3d 1235, 1239-40 (10th Cir. 2011) (quotations omitted).

a. *Minimum contacts*

The minimum contacts test for specific jurisdiction encompasses two distinct requirements: (i) that the defendant must have "purposefully directed its activities at residents of the forum state," and (ii) that "the plaintiff's injuries must arise out of [the] defendant's forum-related activities." *Shrader*, 633 F.3d at 1239 (quotations omitted); *see also Burger King*, 471 U.S. at 475.[10]

i. "Purposeful direction" requirement[11]

The purposeful direction requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475

---

[10] Because we hold that Old Republic has failed to make a prima facie showing of purposeful direction, we do not reach the other elements of the specific jurisdiction analysis. Accordingly, this section provides background primarily on the purposeful direction requirement.

[11] We usually use the term "purposeful direction" in the tort context and "purposeful availment" in the contract context. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1077 (10th Cir. 2008). Here, Old Republic brings a strict liability claim in tort, so we use the term "purposeful direction" throughout this opinion.

Even though it brings a tort claim, Old Republic relies on minimum contacts for jurisdiction that concern contractual understandings between Continental Motors and Colorado FBOs. In our analysis, we draw from cases that involve contractual minimum contacts and that use the term "purposeful availment" because contract claims were alleged.

In any event, the terms "purposeful direction" and "purposeful availment" denote the same requirement. *See id.* at 1071 (explaining that although the purposeful direction requirement "can appear in different guises" in the tort and contract contexts, these guises have the "shared aim . . . [of] ensur[ing] that an out-of-state defendant is not bound to appear to account for merely random, fortuitous, or attenuated contacts with the forum state" (quotations omitted)); *see also J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) (using "purposefully directed" and "purposefully availed" interchangeably).

11

(quotations omitted). Mere foreseeability of causing injury in another state is insufficient to establish purposeful direction. *See id.* at 474. But "where the defendant deliberately has engaged in significant activities within a State, . . . he manifestly has availed himself of the privilege of conducting business there." *Id.* at 475-76 (citations and quotations omitted). Accordingly, "[i]t is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum." *Id.* at 476.

This appeal implicates three frameworks for determining whether an out-of-state defendant's activities satisfy the purposeful direction requirement: (1) continuing relationships with forum state residents ("continuing relationships"); (2) deliberate exploitation of the forum state market ("market exploitation"); and (3) harmful effects in the forum state ("harmful effects"). In cases involving contractual contacts between the defendant and forum state residents, the purposeful direction analysis often employs the first framework. *See id.* at 472-73. The Supreme Court articulated the latter two frameworks in specific jurisdiction cases involving out-of-state media defendants' national distribution of their printed material: *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) (market exploitation) and *Calder v. Jones*, 465 U.S. 783 (1984) (harmful effects). The lower courts have since extended these latter frameworks to specific jurisdiction cases involving internet content.

1) Continuing relationships with forum state residents

The typical purposeful direction analysis looks to the out-of-state defendant's "continuing relationships and obligations with citizens of [the forum state]." *Burger King,* 471 U.S. at 473 (quotations omitted). The Supreme Court "ha[s] upheld the

12

assertion of jurisdiction over defendants who have purposefully 'reached out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State." *Walden*, 134 S. Ct. at 1122 (2014) (brackets omitted) (quoting *Burger King*, 471 U.S. at 473).

"[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id*. at 1123. Instead, we must evaluate the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King*, 471 U.S. at 479. An out-of-state defendant's solicitations of or direct communications with forum state residents also provide "some evidence" suggesting purposeful direction. *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005) (quotations omitted).

2) Deliberate exploitation of the forum state market

An out-of-state defendant's "continuous[] and deliberate[] exploit[ation] [of] the [forum state] market" may also satisfy the purposeful direction requirement. *Keeton*, 465 U.S. at 781. In *Keeton*, the Supreme Court found purposeful direction based on an out-of-state magazine publisher's "regular monthly sales of thousands of magazines" in New Hampshire, the forum state. *Id.* at 774. The Court reasoned that such regular sales "cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Id.* It held that "[w]here . . . [the defendant] has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being

13

haled into court there in a libel action based on the contents of its magazine." *Id.* at 781.[12]

Some circuit courts have applied the *Keeton* analysis in cases where the out-of-state defendant's only contacts with the forum state occurred over the internet or through the media. For example, *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421 (7th Cir. 2010), concerned an out-of-state defendant that operated a domain name registration site. The Seventh Circuit found purposeful direction because the defendant had "thoroughly, deliberately, and successfully exploited the [forum state] market." *Id.* at 427. The court noted that "[forum state] consumers . . . ha[d] flocked to [the defendant] by the hundreds of thousands and . . . sent many millions of dollars to the company each year." *Id.* It also relied on the defendant's "extensive national advertising," including "many television advertisements on national networks . . . [and] extensive venue advertising and celebrity and sports sponsorships." *Id.* The court cited *Keeton* for the principle that "a typical business that operates on a national scale with [the defendant's] sales . . . [,] customer base . . . , and . . . blanket of advertising in [the forum state] would unquestionably be

---

[12] The Court in *Keeton* suggested that the defendant's sales in the forum state could support only specific jurisdiction, not general jurisdiction. *Id.* at 779-80 ("[The defendant's] activities in the forum may not be so substantial as to support jurisdiction over a cause of action unrelated to those activities. But [the defendant] is carrying on a part of its general business in New Hampshire, and that is sufficient to support jurisdiction when the *cause of action arises out of the very activity being conducted*, in part, in New Hampshire." (emphasis added) (footnote and quotations omitted)). The Court did not elaborate on what it means for a cause of action to "arise out of" the defendant's forum state activities. *See id.*

subject to [specific] personal jurisdiction there for claims arising from its business activities that reach into the state." *Id.* at 429.[13]

In contrast, the Seventh Circuit—again applying the *Keeton* analysis—declined to find purposeful direction by an out-of-state defendant that operated an online matchmaking service. *See be2 LLC v. Ivanov*, 642 F.3d 555, 558-59 (7th Cir. 2011). The court held that the plaintiff had failed to show deliberate exploitation of the forum state market. *Id.* at 559. The record "show[ed] that just 20 persons who listed [forum state] addresses had at some point created free dating profiles on [the defendant's website]." *Id.* The court commented that, as far as it could tell from the record, "the 20 [forum state residents] who created free profiles [on the defendant's website] may have done so unilaterally by stumbling across the website and clicking a button that automatically published their dating preferences online." *Id.*

### 3) Harmful effects in the forum state

Purposeful direction may also be established—even in the absence of continuing relationships or market exploitation—when an out-of-state defendant's *intentional* conduct targets and has substantial harmful effects in the forum state. *See Calder*, 465 U.S. at 790-91. In *Calder*, the plaintiff, a California resident, brought a libel suit in a California court against a reporter and an editor from Florida. *Id.* at 789. California was

---

[13] *GoDaddy* went further than *Keeton* in that it considered not only the defendant's forum state sales of the relevant product but also its national advertising. The Seventh Circuit reasoned that these broad contacts supported specific jurisdiction because the plaintiff's claim arose "directly out of [the defendant's domain name registration services] bought by customers it has solicited in [the forum state] and many other states." *Id.* at 432.

also "the focal point both of the story and of the harm suffered." *Id.* at 789. The Supreme Court held "that jurisdiction over [the defendants] in California is proper because of their intentional conduct in Florida calculated to cause injury to [the plaintiff] in California." *Id.* at 791.[14]

In *Walden*, the Court clarified its holding in *Calder*, emphasizing that "the plaintiff cannot be the only link between the defendant and the forum." 134 S. Ct. at 1122. [15] It noted that the defendants' "ample" forum contacts in *Calder* also included the following: "The defendants relied on phone calls to [forum state sources] for the information in their article; they wrote the story about the plaintiff's activities in [the forum state]; they caused reputational injury in [the forum state] by writing an allegedly libelous article that was widely circulated in the State; and the 'brunt' of that injury was suffered by the plaintiff in that State." *Id.* at 1123 (quoting *Calder*, 465 U.S. at 789). The Court also suggested that the defendants' connection to the forum state in *Calder* "was largely a function of the nature of the libel tort." *Id.* at 1124. "However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and

---

[14] In *Calder*, the Court could not rely on the market exploitation basis for personal jurisdiction because, unlike in *Keeton*, the plaintiff sued the reporter and the editor who worked on the allegedly defamatory article rather than their corporate employer. 465 U.S. at 790 ("[Defendants] are correct that their contacts with [the forum state] are not to be judged according to their employer's activities there."). The Court therefore relied instead on the article's harmful effects to establish personal jurisdiction over the defendants. *Id.*

[15] In *Walden*, the plaintiffs brought a *Bivens* civil rights action against an out-of-state police officer (working as a deputized federal Drug Enforcement Administration agent) for out-of-state conduct that allegedly violated the forum state plaintiffs' Fourth Amendment rights. *Id.*

16

understood by) third persons. . . . Indeed, because publication to third persons is a necessary element of libel . . . the defendants' intentional tort actually occurred *in* [the forum state]." *Id.* (citations omitted).

This court has summarized the *Calder* effects test to require three elements: "(a) an intentional action . . . , that was (b) expressly aimed at the forum state . . . , with (c) knowledge that the brunt of the injury would be felt in the forum state." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008). In *Dudnikov*, the plaintiffs, online auctioneers, sought a declaratory judgment that their auction did not infringe copyrights belonging to the out-of-state defendants. *Id.* at 1077. The defendants had sent a notice of claimed infringement to the online auction website (which was operated by a third party), with the specific intention of terminating the plaintiffs' auction. *Id.* at 1078. The record established that the defendants had known that the plaintiffs' business was based in the forum state. *Id.* at 1077. Applying *Calder*, we found purposeful direction because the defendants had intentionally caused harm to the plaintiffs' business in the forum state. *Id.* at 1077-78. [16]

Some courts have applied derivatives of the *Calder* effects test in determining whether a defendant's internet activities that cause harmful effects in the forum state may support personal jurisdiction. Such cases usually involve claims like defamation and

---

[16] After *Dudnikov*, the Supreme Court reemphasized the importance of the defendant's intentional contacts with the forum state, "not just to a plaintiff who lived there." *Walden*, 134 S. Ct. at 1122.

trademark infringement, which are generally considered *intentional* torts.[17] In *Shrader*,

we cited with approval this kind of "*Calder*-derived analysis for specific jurisdiction in

the internet context." *See* 633 F.3d at 1241.[18] We noted that "it is necessary to adapt the

analysis of personal jurisdiction to this unique circumstance by placing emphasis on the

internet user or site *intentionally directing* his/her/its activity or operation *at* the forum

state rather than just having the activity or operation accessible there." *Id*. at 1240.

Accordingly, "[t]he maintenance of a web site does not in and of itself subject the owner

or operator to personal jurisdiction, even for actions relating to the site, simply because it

can be accessed by residents of the forum state." *Id*. at 1241. Instead, we "look to

indications that a defendant deliberately directed its message at an audience in the forum

state and intended harm to the plaintiff occurring primarily or particularly in the forum

state." *Id.*

### ii. "Arising out of" requirement

Step two of the minimum contacts test requires us to determine whether the

plaintiff's injuries "arise out of" the defendant's forum-related activities. *See id.* at 1239.

---

[17] *See, e.g.*, *Clemens v. McNamee*, 615 F.3d 374, 379 (5th Cir. 2010) (emphasizing "*Calder*'s requirement that the forum be the focal point of the story" in evaluating "personal jurisdiction against the defaming defendant" (quotations omitted)); *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008) (holding that the plaintiff's trademark infringement allegations "satisf[ied] the *Calder* effects test for personal jurisdiction—the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum").

[18] In endorsing this approach, we declined to take a definitive position on the sliding-scale test proposed in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) (proposing a sliding scale based on a website's relative interactivity).

"In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (alterations omitted) (quoting *Goodyear*, 564 U.S. at 919). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id*.; *see also Goodyear*, 564 U.S. at 930 n.6 ("[E]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales.").

b. *Fair play and substantial justice (reasonableness)*

Even if a plaintiff has met its burden of establishing minimum contacts, "[w]e must still inquire whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice." *Shrader*, 633 F.3d at 1240 (quotations omitted); *see also Int'l Shoe*, 326 U.S. at 316. "In doing so, we are cognizant of the fact that, with minimum contacts established, it is incumbent on defendants to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Dudnikov*, 514 F.3d at 1080 (quotations omitted).

We determine whether jurisdiction is reasonable by considering the following factors: "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies." *Pro Axess*, 428 F.3d at 1279-80 (quotations omitted).

19

C. *Analysis*

We affirm the district court's grant of Continental Motors' motion to dismiss. As discussed above, specific personal jurisdiction requires (1) minimum contacts to show that (a) the defendant purposefully directed its activities at the forum state, and (b) the plaintiff's cause of action arose out of those activities;[19] and (2) the exercise of jurisdiction would be reasonable and fair. We resolve this case on the purposeful direction requirement alone. We analyze Continental Motors' Colorado contacts under the three purposeful direction frameworks implicated by the arguments on appeal: (1) continuing relationships; (2) market exploitation; and (3) harmful effects. On appeal, the only contacts Old Republic relies on for specific personal jurisdiction are those relating to Continental Motors' website, its online service manuals, and Arapahoe Aero's ongoing participation in the FBO Program.[20]

---

[19] The purposeful direction and "arising out of" requirements together comprise the minimum contacts analysis. *See Shrader*, 633 F.3d at 1239. Courts do not always address these requirements separately or in the same sequential order. *See, e.g.*, *Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 617 (10th Cir. 2012) ("For specific jurisdiction, [the plaintiff's] injuries must arise out of or relate to activities that [the defendant] purposefully directed at residents of the forum."); *see also* 4A C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1069 (4th ed., April 2017 update) (listing the "arising out of" requirement first and the purposeful direction requirement second).

[20] In the district court, Old Republic also alleged the following contacts: (1) Continental Motors' distribution contract with a Colorado distributor of aircraft parts and attendant sales of $481,230 in the five-year period leading up to the Aircraft accident; (2) its sales of $2,891,663 directly to Colorado customers in the same period; (3) its acceptance of warranty claims from Colorado customers in the same period; (4) its mailings of promotional materials to Colorado customers from 2012 to 2013; and (5) its enrollment of 19 other Colorado FBOs in the FBO Program in the five-year period leading up to the Aircraft accident.

We conclude that Old Republic has not made a prima facie showing based on these contacts under any of the relevant purposeful direction frameworks.[21]  Although Old Republic points to some continuing relationship contacts, we reject specific jurisdiction here based on comparing this case with other relevant precedent.  Because we hold that Old Republic has failed to carry its burden to show purposeful direction, we do not reach the "arising out of" and reasonableness components of the specific jurisdiction analysis.

1.  **Continuing relationships**

Old Republic contends that jurisdiction is proper based on the binding agreement and continuing relationship resulting from Arapahoe Aero's enrollment in Continental Motors' FBO Program.  But Old Republic has failed to show purposeful direction under the continuing relationships framework.

---

We do not consider contacts (1)-(4) because Old Republic does not argue them on appeal.  As to contact (5), even assuming—without deciding—that Continental Motors' relationships with the 19 other FBOs are relevant to the specific (as opposed to general) jurisdiction analysis, we conclude, as explained below, that they do not establish purposeful direction.

[21] Old Republic does not base its jurisdictional argument on Continental Motors' sales of the allegedly defective magnetos.  Aplt. Br. at 11 ("The product here is not primarily the magnetos sold with the airplane, but the service manuals . . . that control how the magnetos are to be inspected and maintained.").  We therefore have no occasion to consider whether specific jurisdiction might be proper under the stream-of-commerce theory.  *See generally J. McIntyre Machinery*, 564 U.S. 873; *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987).  The stream-of-commerce theory typically governs cases in which the defendant sells a defective product to a third party who takes the product into the forum state.  *See Asahi*, 480 U.S. at 109-112.  Absent the magnetos, the facts of the present case take us outside the stream-of-commerce theory because Continental Motors engaged in direct sales of the FBO Program to Colorado customers.

21

The bare fact that Continental Motors entered into a legal relationship with Arapahoe Aero, a Colorado entity, cannot establish sufficient contacts to satisfy the purposeful direction requirement. *See Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.").[22] We must instead determine whether Continental Motors "reach[ed] out beyond one state and create[d] continuing relationships and obligations with" Arapahoe Aero. *See id.* at 473 (quotations omitted). In making this determination, we must evaluate (a) the parties' "prior negotiations," (b) their "contemplated future consequences," (c) "the terms of the[ir] contract," and (d) "the parties' actual course of dealing." *Id.* at 479. The record before us shows that the parties contemplated some potentially ongoing consequences of Arapahoe Aero's participation in the FBO program. But the absence of prior negotiations, long-term contractual commitments, or any significant course of dealing distinguish this case from previous cases finding purposeful direction under the continuing relationships framework.

a. *Prior negotiations*

Old Republic has not alleged any facts suggesting that Continental Motors and Arapahoe Aero communicated before Arapahoe Aero's enrollment in the FBO Program in 1996. It alleges only that Arapahoe Aero "agreed to [Continental Motors'] terms and

---

[22] Continental Motors disputes Old Republic's characterization of the FBO Program as a contract or binding agreement. Taking the undisputed facts pled by Old Republic as true and viewing them in the light most favorable to it, we agree that Arapahoe Aero's participation in the FBO Program established a contract.

conditions and paid . . . a monetary fee for the privilege" of participating in the FBO Program. App., Vol. I at 48-49. These allegations provide no indication that Continental Motors engaged in prior negotiations with Arapahoe Aero.

b. *Contemplated future consequences*

Old Republic alleged that, as a consequence of Arapahoe Aero's participation in the FBO Program, Continental Motors "lists Arapahoe Aero [on] its [FBO Locator webpage], and grants Arapahoe Aero electronic access to . . . maintenance, service and support, and overall manuals over the internet." *Id.* at 43. Additional future consequences supported by the record include: (1) Arapahoe Aero's right to send two representatives to a week-long training at the Continental Motors factory in Mobile, Alabama; (2) a reward of $500 for every Continental Motors engine Arapahoe Aero installed; and (3) access to dedicated customer support. *Id.* at 58. Because Continental Motors advertised these benefits on its website, the parties appeared to contemplate them as potential future consequences of Arapahoe Aero's participation in the FBO Program.

The FBO Locator webpage and Arapahoe Aero's one-time opportunity to send representatives to attend a training in Alabama do not show that the parties "envisioned continuing and wide-reaching contacts" between Continental Motors and Colorado. *See Burger King*, 471 U.S. at 480. The rewards system and the dedicated customer support provide stronger support because they create the possibility of repeated communications between Continental Motors and Arapahoe Aero. Even though Old Republic makes no specific allegations that Arapahoe Aero ever took advantage of these benefits, the option to do so presumably remained open at all relevant times. Indeed, the FBO Program

23

webpage likens the availability of Continental Motors' "[h]ighly-trained technical staff" to "having your own dedicated technical service representative at your facility." App., Vol. I at 58.

c. *Terms of the contract*

The FBO T&C provides little indication that Continental Motors "reach[ed] out beyond one state and create[d] continuing relationships and obligations with" Arapahoe Aero. *See Burger King*, 471 U.S. at 473 (quotations omitted). *Burger King* provides an instructive contrast. In *Burger King*, the out-of-state defendant had negotiated and entered into a "carefully structured 20-year [franchise agreement] that envisioned continuing and wide-reaching contacts with [the franchisor] in [the forum state.]" *Id.* at 480. The agreement's provisions included that: (1) forum state law governed the franchise relationship, (2) the defendant franchisee paid an initial $40,000 franchise fee and committed to paying monthly fees to the franchisor's headquarters in the forum state, (3) the defendant agreed to abide by the franchisor's "exacting regulation of virtually every conceivable aspect of [the defendant's] operations," and (4) the franchisor worked directly with the defendant in attempting to resolve major problems. *Id.* at 465-66. Based on these provisions, especially the defendant's "acceptance of the long-term and exacting regulation of his business from [the franchisor's forum state] headquarters," the Supreme Court found purposeful direction on the defendant's part. *Id.* at 480-81.

24

In contrast, Arapahoe Aero's annual payments of the FBO Program fee created at most one-year agreements with minimal obligations.[23]  In exchange for an FBO's one-time credit card payment, the FBO T&C seemingly obligates Continental Motors to "initiate a FBO Reward payment" upon verifying that a participating FBO installed one of its engines.  App., Vol. I at 63.  But it also states that Continental Motors "reserves the right to make changes or terminate this program at any time."  *Id.*  Besides the rewards program, the FBO T&C contains no mention of the other benefits advertised on the FBO Program webpage.  Nor does it contain any choice-of-law provision.  The FBO T&C, unlike the franchise agreement in *Burger King*, contemplates only short-term and minimal obligations.

d.  *Actual course of dealing*

Old Republic also fails to demonstrate an actual course of dealing between Continental Motors and Arapahoe Aero—such as solicitations or direct communications—that suggests purposeful direction.  *See Pro Axess, Inc.*, 428 F.3d at 1277.  In contrast, the plaintiffs in *Pro Axess* made such a demonstration.  In *Pro Axess*, the out-of-state defendant, a sunglasses distributor, had contracted with the plaintiff, a forum state business, for the plaintiff's services in arranging for the manufacture and delivery of 28,000 frames.  *Id.* at 1275.  We found purposeful direction based on two factors.  First, the defendant had sought to manufacture low-cost frames in Asia and "specifically sought out" the plaintiff for its "long-standing business relationships with

_____

[23] Old Republic does not tell us, and the record does not indicate, whether the agreement renews automatically upon expiration.

many manufacturers" there. *Id.* at 1277. "While not conclusive, this solicitation is itself some evidence suggesting purposeful availment." *Id.* (quotations omitted). <u>Second</u>, the defendant and its subsidiary—which had conducted previous business dealings with the plaintiff—also "exchanged various direct communications with" the plaintiff. *Id.* These communications included "numerous faxes, letters, and phone calls with [the plaintiff] about the order itself and the potential for modifications to the order." *Id.* at 1278. "Although phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts, such materials provide additional evidence that [the defendant] pursued a continuing business relationship with a [forum state] corporation." *Id.* at 1277-78 (citation and quotations omitted).

In contrast, Old Republic does not allege that Continental Motors specifically sought out Arapahoe Aero's business or engaged in any direct communications with it. Continental Motors may have sought FBO Program subscriptions through its webpage, which describes the program's benefits and encourages FBOs to join. But this webpage shows only that Continental Motors sought the business of any FBO in the world, unlike in *Pro Axess*, where the defendant "specifically solicited the contract at issue in this case." *Id.* at 1277 n.3. Nor does Old Republic allege any direct communications between Arapahoe Aero and Continental Motors relating to the FBO Program. The record—in particularly the FBO T&C —allows us to infer that at least one email communication must have occurred. App., Vol. I at 62 ("Once your membership is approved, you will receive notification via email asking you to activate your account."). But beyond this initial confirmation email, no other direct communications between

26

Arapahoe Aero and Continental Motors apparently took place. The fact that Continental Motors did not seek out Arapahoe Aero's business and the dearth of direct communications between the parties distinguish this case from *Pro Axess*.

e. *Comparison with other cases*

We next compare this case with this court's relevant precedents on purposeful direction and continuing relationships. As discussed above, we credit Old Republic's evidence as tending to show that Continental Motors and Arapahoe Aero contemplated some ongoing future consequences to their relationship. In particular, Continental Motors' online assurances of dedicated customer service for FBOs suggest that it envisioned potential future exchanges with Arapahoe Aero, a Colorado business. But Old Republic has not alleged that any such exchanges actually took place. Nor has it demonstrated any prior negotiations, contract terms, or course of dealing between Continental Motors and Arapahoe Aero suggesting a continuing relationship.

In *Soma Medical*, this court held that an international banking institution that had wrongfully disbursed funds from the forum state plaintiff's international account did not purposefully direct its activities at the forum state. 196 F.3d at 1294-95. In doing so, we "examine[d] the quantity and quality of [the defendant's] contacts with [the forum state], including 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Id.* at 1298 (quoting *Burger King*, 471 U.S. at 479). Ignoring contacts "unrelated to" the plaintiff's claims, we considered the defendant's following contacts with the forum state: (1) mailing a signature card to the plaintiff in the forum state; (2) sending two letters to the plaintiff's

27

forum state location soliciting signature verification; (3) initiating 14 other written communications with the plaintiff concerning its account; (4) creating an account number for the plaintiff, which acknowledged its forum state address; and (5) creating internal records of the plaintiff's account activities. *See id.* We found these contacts alone insufficient to show purposeful direction for two reasons: (1) based on the record, the plaintiff failed to show that the defendant solicited the plaintiff's business, and (2) the limited number of communications concerning the account did not suffice. *Id.* at 1299.

In contrast to *Soma Medical*, we found purposeful direction in *Benton* based on the out-of-state defendant's joint venture to conduct uranium transactions with the plaintiff, a forum state resident. 375 F.3d at 1073. Noting at the outset that this was a "very close case," we determined that these contacts sufficed to establish purposeful direction. *Id.* at 1076-78.[24] We found that "[t]he 'prior negotiations' and the 'contemplated future consequences' of the [agreement] centered around the continuing relationship between [the defendant] and [the plaintiff]" for two reasons. *Id.* at 1077. <u>First</u>, under the agreement, "the business end of the transactions—the brokering of the deals, the coordination of the parties, the exchange of money and information between the parties, and the decision-making behind the joint venture—would take place . . . partially in [the forum state]." *Id.* <u>Second</u>, "[a]lthough phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts, the correspondence exchanged

---

[24] Although the defendant's contacts satisfied the minimum contacts test (which includes the purposeful direction requirement), we nevertheless held that specific jurisdiction was improper based on the fair play and substantial justice (or reasonableness) prong of the due process analysis. *Benton*, 196 F.3d at 1081.

between [the parties] during the negotiation of the [agreement][25] provides additional evidence that [the defendant] pursued a business relationship with a [forum state] business." *Id.* (citation and quotations omitted).[26]

Here, Old Republic has shown some—but not enough—contacts to establish purposeful direction under the continuing relationships framework. It has shown recurring contacts between Continental Motors and Arapahoe Aero—annual payments for FBO Program membership—over the course of 20 years. And based on its website, Continental Motors contemplated some future contacts—such as providing dedicated customer support—with participating FBOs like Arapahoe Aero. That said, the FBO T&C created at most one-year agreements, with minimal obligations, each time Continental Motors accepted Arapahoe Aero's payments. Old Republic also has not shown that Continental Motors specifically sought out Arapahoe Aero or negotiated an agreement with it. And it has pointed to only minimal direct communications between Continental Motors and Arapahoe Aero.

---

[25] This correspondence included sending several employees to the plaintiff's office in the forum state to conduct due diligence review. *Benton*, 196 F.3d at 1077.

[26] *See also Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1163 (10th Cir. 2011) (finding purposeful direction based on the defendant's 10-year agency relationship with the forum state plaintiff, under which the defendant (1) communicated with the plaintiff's staff in the forum state on at least a monthly basis, (2) submitted expenses reimbursement requests to the plaintiff's forum state office, and (3) personally came to the forum state at least twice as a result of the agency relationship); *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1059-60 (10th Cir. 2008) (finding purposeful direction when the defendant (1) distributed the forum state plaintiff's products for seven years under an agreement the defendant had solicited, (2) placed orders with the plaintiff by phone fax, or email, and (3) received product shipments from the forum state).

Overall, the record makes this case more like *Soma Medical* than like *Burger King*, *Pro Axess*, or *Benton*.[27]  The record here falls short of the circumstances suggesting purposeful direction in the latter cases.  It fails to show that Continental Motors specifically sought to do business, negotiated a contract envisioning significant and long-term obligations, or conducted frequent and regular communications with Arapahoe Aero.  Old Republic therefore has not sufficiently established purposeful direction based on Continental Motors' continuing relationship with Colorado-based Arapahoe Aero.[28]

2. **Market Exploitation**

Old Republic contends that "Continental Motors clearly availed itself of the Colorado market . . . and cannot complain about being held to answer in Colorado for defective and unreasonably dangerous manuals it distributed [t]here."[29]  Aplt. Reply Br.

---

[27] In reaching this determination, we do not rely on Continental Motors' attempts to characterize Arapahoe Aero's enrollment in the FBO Program and its access to the online manuals as a "unilateral" and "automatic" process.  *See* Aplee. Br. at 17-19.  The record contradicts this characterization.  *See, e.g.*, App, Vol. I at 62 (provision in the FBO T&C stating that Continental Motors "will review [an FBO's] submitted profile and determine qualifications and eligibility for the program" before approving membership).  To the extent the evidence presents a factual ambiguity, we resolve it in favor of Old Republic.  *See Benton*, 375 F.3d at 1074.

[28] Even if we considered the 19 Colorado FBOs besides Arapahoe Aero—assuming that Continental Motors' contacts with them satisfy the "arising out of" element of the minimum contacts analysis—our conclusion would not change.  The record contains no information on Continental Motors' contacts with the other FBOs beyond what we have already determined fails to show purposeful direction.

[29] Again, although its complaint also alleged defective magnetos, Old Republic has waived any jurisdictional argument based on Continental Motors' sales of magnetos to Colorado customers.  *See* Aplt. Br. at 11.

at 2.  But Old Republic has failed to show purposeful direction based on Continental Motors' website and its sales of membership in the FBO Program to Colorado customers.

Continuous and deliberate exploitation of the forum state market can satisfy the minimum contacts standard for specific jurisdiction over an out-of-state defendant in a suit arising from its related sales there.  *See Keeton*, 465 U.S. at 781.  Factors suggesting purposeful direction based on forum state market exploitation include:  (a) high sales volume and large customer base and revenues, and (b) extensive nationwide advertising or ads targeting the forum state.  *See id.* (sales); *GoDaddy*, 623 F.3d at 427 (sales, revenues, customer base, and nationwide advertising); *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014) (suggesting that jurisdiction may have been proper if "there were evidence that a defendant in some way targeted residents of a specific state, perhaps through geographically-restricted online ads").  Old Republic has not shown sufficiently extensive Colorado sales, revenues, or advertising relating to the FBO Program to support jurisdiction over Continental Motors under the *Keeton* market exploitation framework.

a.  *Sales volume, customer base, and revenues*

"Substantial" and "regular" sales in the forum state can constitute deliberate exploitation of its market.  *See Keeton*, 465 U.S. at 774, 781.  Old Republic alleged that "[d]uring the 5 years preceding the crash at issue, [Continental Motors] entered into agreements with Arapahoe Aero and 19 other Colorado-based FBO's, whereby Arapahoe Aero (and other Colorado FBO's) paid [Continental Motors] subscription fees to gain 24/7 access to [its online service manuals]."  App., Vol. I at 44.  Membership in the FBO

31

Program costs about $240 annually, though in 1996 it cost about $1,000.[30]  The FBO

Program's annual membership of 20 paying Colorado FBOs pales in comparison to the

regular and substantial magazine sales made in the forum state by the out-of-state

publisher in *Keeton*.  *See* 465. U.S. at 772 (defendant sold "10 to 15,000 copies of [its]

magazine in [the forum state] each month").[31]  Nor do Continental Motors' FBO

Program customer base and revenues come near to the defendant's in *GoDaddy*.  *See* 623

F.3d at 432-33 (defendant sold to "hundreds of thousands of customers in the [forum]

state" and earned "millions of dollars in revenue from the state each year").[32]

    b.  *Advertising efforts*

    Old Republic also contends that Continental Motors deliberately exploited the

Colorado market because it engaged in a nationwide marketing effort to all FBOs

throughout the country.  Aplt. Reply Br. at 2-3.  In *GoDaddy*, as Old Republic points out,

---

[30] Continental Motors argues that, by the time Arapahoe Aero inspected the Aircraft in December of 2013, all the manuals Arapahoe Aero allegedly consulted were available for free online.  This argument speaks to whether Old Republic's claim "arises under" Continental Motors' sales of FBO Program membership in Colorado.  Because we hold that Old Republic's personal jurisdiction argument fails under the first step of the minimum contacts analysis—purposeful direction—we need not reach step two—whether Old Republic's claim arises out of the minimum contacts.

[31] The record also suggests that Continental Motors may have made individual sales of its online manuals outside of the FBO Program, but Old Republic does not make any allegations relating to such sales.

[32] Old Republic argues that the low volume of sales and number of customers should be taken in context, because "[t]here are not millions of FBO's in Colorado, nor are there millions of airplane owners."  Aplt. Reply Br. at 6.  Although we agree and do consider the context, we nevertheless cannot conclude that Continental Motors deliberately exploited the Colorado market, looking solely at the sales of FBO Program memberships—as opposed to its broader sales of its products, which are not at issue here.

32

the Seventh Circuit found purposeful direction as to an out-of-state defendant that operated a domain name registration website, in part based on its extensive "national advertising campaign" on behalf of its site. 623 F.3d at 429; *see* Aplt. Reply Br. at 3. The defendant's advertising campaign included "many television advertisements on national networks . . . [and] extensive venue advertising and celebrity and sports sponsorships." *GoDaddy*, 623 F.3d at 427.

Continental Motors' marketing efforts on behalf of its FBO Program bear little resemblance to the defendant's sustained national advertising campaign in *GoDaddy*. The record contains no evidence that Continental Motors launched national television commercials, placed physical advertisements in Colorado venues, or obtained celebrity sponsorships for the FBO Program. Indeed, the record evinces only one marketing platform—Continental Motors' FBO Program webpage.[33] Nor does Old Republic alert us to any FBO Program marketing targeted at Colorado, such as geographically-restricted online ads. *See Advanced Tactical Ordnance*, 751 F.3d at 803 (suggesting that geographically-restricted ads may provide some evidence of purposeful direction).

* * * *

Contrary to Old Republic's assertions, therefore, Continental Motors' FBO Program sales, revenues, customer base, and marketing efforts more closely resemble the

---

[33] Although Old Republic furnished evidence of substantial solicitations and mailings from Continental Motors to its Colorado customers in the district court, it does not mention them in its brief and therefore has waived any argument for jurisdiction based on these contacts on appeal. In any event, these solicitations do not relate to the FBO Program, from which Old Republic's cause of action allegedly arises.

defendant's in *Ivanov*, a case decided by the Seventh Circuit shortly after *GoDaddy*. In *Ivanov*, the court declined to find purposeful direction based on the out-of-state defendant operation of an online matchmaking service used by 20 forum state residents. 642 F.3d at 559 ("We see no evidence that . . . might make this case more comparable to GoDaddy's massive and successful exploitation of the [forum state] market . . . through an advertising campaign that produced hundreds of thousands of customers in the state and millions of dollars in annual revenues.").

In light of the foregoing, Old Republic has not established purposeful direction based on Continental Motors' marketing and sales of FBO Program membership to Colorado customers.

### 3. **Harmful Effects**

Old Republic seeks to establish purposeful direction based on the harmful effects of Continental Motors' defective manuals in Colorado—the damage to the Aircraft. Even assuming—without deciding—that the harmful effects framework applies in a strict liability action—Old Republic has failed to show purposeful direction under this framework.[34]

---

[34] As discussed above, *Calder* established the harmful effects test in the defamation context, and there is reason to question its applicability in the circumstances here. In *Calder*, the Supreme Court noted that the defendants were accused of the intentional tort of defamation and were "not charged with mere untargeted negligence," let alone strict products liability. 465 U.S. at 789. Although we applied a *Calder*-derived analysis in the internet context in *Shrader*—also a defamation case—we focused primarily on the "express aiming" requirement rather than on the effects felt in the forum state. *See* 633 F.3d at 1241. Moreover, the Supreme Court has recently suggested that the *Calder* effects test does not extend beyond the defamation context. *Walden*, 134 S. Ct. at 1123-24 ("The crux of *Calder* was that the reputation-based 'effects' of the alleged

Old Republic argues that "not only did [Continental Motors] knowingly sell its publications to Arapahoe Aero in Colorado, but it knew that they would be used by Arapahoe Aero nowhere else but Colorado, and that any harmful effects of the publications would be felt in Colorado." Aplt. Br. at 17. But the Supreme Court recently clarified that the *Calder* effects test requires showing more than simply harm suffered by a plaintiff who resides in the forum state. *Walden*, 134 S. Ct. at 1125 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."). In the internet context, this court has stated that "merely posting information on the internet does not, in itself, subject the poster to personal jurisdiction wherever that information may be accessed." *Shrader*, 633 F.3d at 1244. Instead, "courts look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id.* at 1241. [35]

Old Republic has failed to allege facts supporting its conclusory claim that Continental Motors "targeted its information to . . . Colorado." *See* Aplt. Br. at 12. Continental Motors' mere awareness that Colorado FBOs had enrolled in the FBO Program does not amount to targeting Colorado. *See Dudnikov*, 514 F.3d at 1077 ("We

---

libel connected the defendants to [the forum state], not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort.").

[35] We do not take the "intending harm" language in *Shrader* literally to mean that the defendant must actually intend to harm forum state residents, as this would foreclose jurisdiction over most, if not all, out-of-state defendants. We instead ask whether the defendant intended its online content to create effects specifically in the forum state.

surely agree that under *Calder* the mere foreseeability of causing an injury in the forum state is, standing alone, insufficient to warrant a state exercising its sovereignty over an out-of-state defendant."). Nothing about Continental Motors' FBO Program webpage or its service manuals appears deliberately directed at Colorado, either in terms of its content or its intended audience.[36] Old Republic's recognition that FAA regulations require Continental Motors to make its service manuals available to certified repair stations and FBOs further bolsters this conclusion.[37] Because the FAA mandate obligates it to make service manuals available to any FBO subject to federal regulation, Continental Motors needed to target its manuals' content at an audience broader than only Colorado FBOs to comply with this requirement.

In light of the foregoing, Old Republic has not established purposeful direction under the *Calder* harmful effects framework based on Continental Motors' online

---

[36] The FBO Locator page—which allows patrons to search for FBOs by country, state, and city—contains some geographic content insofar as it allows Colorado residents to look up Colorado FBOs. But Continental Motors makes this search function available to anyone anywhere. In any event, the "arising out of" requirement likely bars consideration of the FBO Locator page because it bears no causal relation to Old Republic's alleged harm. *See Shrader*, 633 F.3d at 1246 n.8 (stating that the "arising out of" requirement includes "a true causal element").

[37] Continental Motors argues that the FAA mandate "establishes, *per se*, that posting [the manuals] on [its] website is not targeted to Colorado or any other individual state." Aplee. Br. at 22. We do not rely on this per se argument because the mandate does not preclude Continental Motors from taking other measures to target its website and FBO Program content at Colorado.

publication of allegedly defective service manuals and the resulting damage to the Aircraft.[38]

* * * *

Old Republic has failed to show that Continental Motors pursued continuing relationships with Colorado residents, deliberately exploited the Colorado market, or targeted defective content at Colorado. At most, the record supports the following contacts: (1) Continental Motors maintained a geographically-neutral website that advertised the FBO Program and allowed participants, including Colorado FBOs, to access online service manuals and bulletins; (2) it entered into repeated one-year agreements, which it did not specifically seek out or negotiate, with 20 Colorado FBOs in the five years preceding the Accident; (3) it contemplated some ongoing obligations—such as providing dedicated customer support—for the duration of these agreements; (4) it listed the FBOs on its website; (5) it sent one email to each FBO with account activation instructions; (6) it earned $5,200 a year from the FBO Program; (7) one of the FBOs, Arapahoe Aero, has participated in the FBO Program since 1996; and (8) Arapahoe Aero's reliance on Continental Motors' allegedly defective, geographically-neutral online content allegedly caused a financial loss to Old Republic's subrogor in Colorado.

Although not altogether without force, these contacts fall short of the purposeful direction requirement in light of the foregoing analysis. "[A] defendant's relationship

---

[38] Even were we to consider the 19 other Colorado FBOs—assuming that Old Republic's claim "arises out of" these contacts—our analysis would not change. The record does not show any harmful effects to the other FBOs caused by the Manual.

with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 134 S. Ct. at 1123. Rather, "there [must] be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State." *Burger King*, 471 U.S. at 475 (quotations omitted). In this case, Old Republic has failed to demonstrate a purposeful act on Continental Motors' part by which it "established . . . meaningful contacts, ties, or relations" with Colorado. *Id.* at 471 (quotations omitted). We therefore hold that Old Republic has failed to make a prima facie showing of specific personal jurisdiction.

## III. CONCLUSION

We affirm the district court's order granting Continental Motors' motion to dismiss for lack of personal jurisdiction.