**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

XMISSION, L.C. a Utah company,

    Plaintiff - Appellant,

v.

FLUENT LLC, a New York limited
liability company,

    Defendant - Appellee,

and

9 FOUR ONE MEDIA; ABOVE ALL
OFFERS; THE AFFILIATI NETWORK;
AGORA FINANCIAL,

    Defendants.

No. 18-4161

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:18-CV-00182-RJS-PMW)**
_____

Dick J. Baldwin, Zimmerman Booher, Salt Lake City, Utah (Troy L. Booher, and Beth E. Kennedy, Zimmerman Booher, Salt Lake City, Utah, and Jordan K. Cameron, Durham Jones & Pinegar, P.C., Lehi, Utah, with him on the briefs), for Plaintiff-Appellant.

Derek A. Newman (Keith Scully, with him on the brief), Newman Du Wors LLP, Seattle, Washington), for Defendant-Appellee.
_____

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.

_____

Plaintiff XMission, L.C. appeals the ruling of the district court dismissing its claims against Fluent LLC for lack of personal jurisdiction over Fluent in Utah. On the record and arguments before us, we must affirm.

## I.    Background

The information about Fluent in the record is sparse. We have only XMission's complaint; a declaration by Peter L. Ashdown, XMission's president and chief technical officer, with exhibits; a declaration by Daniel J. Barsky, Fluent's general counsel and chief compliance officer; and two Fluent filings with the Securities and Exchange Commission. We accept as true the well-pleaded ("that is, plausible, non-conclusory, and non-speculative") facts alleged in the complaint, *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008), unless they are controverted by sworn statements, *see Shrader v. Biddinger*, 633 F.3d 1235, 1248 (10th Cir. 2011). Perhaps XMission could have obtained through discovery some additional information to support jurisdiction; but it conducted no jurisdictional discovery in district court. At the hearing on Fluent's motion to dismiss for lack of personal jurisdiction, counsel for XMission requested the opportunity to conduct discovery; but the district court rejected the request as untimely, and XMission has not challenged that ruling on appeal.

Fluent is a Delaware limited liability company with its principal place of business in New York. It describes its service as digital marketing; its business model apparently is based on supplying consumer data to businesses. The record contains screenshots from

2

Fluent's website taken on April 3, 2018. The website touts that "Fluent's platform is rooted in first-party data collected in real-time on a perpetual basis to evolve how brands target and engage with consumers. We go beyond anonymous pixels and cookies and interact with real people in order to deliver scalable performance marketing programs." J.A., Vol. 1 at 172. It says that "Fluent interacts with millions of registered users across our network and captures six million survey responses from them daily." *Id.* at 173.

XMission is a Utah limited liability company with its principal place of business in Salt Lake City, Utah. As an internet service provider (ISP), it uses servers and other hardware that it owns and operates in Utah to provide internet access for its commercial and residential customers. It also provides email hosting and other internet-related services. Any email sent to a domain hosted by XMission will arrive on XMission's email servers in Utah.

XMission's complaint against Fluent is based on more than 10,000 emails sent from 2015 to early 2018 to more than 1,100 XMission customers in Utah through its servers, allegedly in violation of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), 15 U.S.C. §§ 7701 to 7713; 18 U.S.C. § 1037. The CAN-SPAM Act regulates commercial emails. It prohibits the use of false or misleading "transmission information," including deceptive subject headings and domain names, for any commercial email sent to a protected user, 15 U.S.C. § 7704(a)(1); and it requires the inclusion of "a valid physical postal address of the sender," *id.* § 7704(a)(5)(iii). The Act creates a cause of action for ISPs to enforce its

3

provisions. *See id.* § 7706(g)(1). Statutory damages and attorney fees can be awarded to prevailing ISPs. *See id.* §§ 7706(g)(3)(A)–(D), (g)(4).

XMission's complaint alleges that Fluent violated the CAN-SPAM Act by sending or causing to be sent emails through XMission's servers that (1) had generic "from names" and false or misleading domain and registration information in the header, (2) originated from domains registered with false information, and (3) failed to include the physical address of the sender. It claims that the offending emails resulted in over 5,200 customer complaints to XMission of spam.

The offending emails contain offers to consumers for rewards from major restaurants and retailers such as Chipotle, Starbucks, and Walmart. They appear as though they are being sent from the restaurants and retailers themselves. They instruct the recipient to follow a link to obtain the offered reward. By clicking the link, the recipient is taken to a Fluent-controlled data-gathering domain that prompts the recipient to enter personal information such as name, age and date of birth, gender, email address, social media activity, zip code, and street address. Fluent apparently collects and aggregates the consumer information and sells this personal data to others to assist them in developing targeted marketing campaigns. The record does not disclose whether the email recipients actually obtain any rewards from the named companies or whether Fluent is compensated in any way by those companies for these emails.

According to Barsky's declaration, Fluent itself did not send the offending emails. He says that Fluent contracts with third parties, called "publishers," who distribute the emails. Each publisher has an "audience" of consumers. Fluent has no involvement with

4

or control over the origination, approval, or delivery of the emails. It does not review the emails before they are sent, nor does it know the locations of the recipients nor decide who should receive the emails. Fluent instructs the publishers to send emails only to consumers who have agreed to receive them. The publishers are compensated by Fluent based on identified "triggering actions," such as when a consumer clicks on an emailed link, visits a designated website, or purchases the advertised product or service.

XMission presented no specific evidence contradicting Barsky's account of Fluent's involvement with the emails—it offered no evidence that Fluent itself delivered emails, had a business relationship with Utah publishers, or knew that any publishers were sending emails to Utahns. All it produced on the matter was Ashdown's declaration that almost 13% of the offending emails were directed to email addresses containing a Utah domain name and some of the emails appeared to have originated from a publisher with a domain name registered in Utah.

Nor was there specific evidence of any other activity of Fluent connected to Utah. According to Barksy's declaration:

- "Fluent has never been registered to do business in Utah."
- "Fluent has never had any offices of any kind in Utah."
- "Fluent has never employed any persons in Utah."
- "Fluent has never owned or leased any commercial property or property of any kind in Utah."
- "Fluent has never had any assets in the State of Utah."
- "Fluent has never had a telephone or telephone listing in Utah."
- "Fluent has never undertaken to market or advertise in Utah or to target or direct any internet marketing directly to Utah residents."
- "Fluent does not maintain any bank accounts in Utah."
- "Fluent does not have any members or managers that reside in Utah."

- "Fluent does not have regular sales personnel in Utah, nor does it recruit employees in Utah."

J.A., Vol. 1 at 54.[1]

Barsky did state that less than .9% of Fluent's revenue is earned from Utah customers. (XMission calculated from Fluent's financial statements that this amounted to about $3 million in revenue from Utah during the roughly three-year period in which the offending emails were sent.) But there is no evidence that Fluent generated any of this revenue from the 10,000 offending emails sent through XMission servers in Utah. Indeed, although Fluent's business model appears, at least in part, to involve selling the consumer data that it aggregates, XMission concedes that nothing in the record shows that Fluent sold the consumer data collected through the offending emails to Utah advertisers or to advertisers in other states. Nor is there any indication that anyone from Utah ever even opened one of these emails, clicked a link, and provided personal information to Fluent, or that Fluent had any knowledge of these emails or contact with XMission before XMission filed suit.

XMission filed suit against Fluent[2] in February 2018 in the United States District Court for the District of Utah. Fluent moved under Fed. R. Civ. P. 12(b)(2) to dismiss

---

[1] Barsky states at ¶ 7 of his declaration that "[n]one of Fluent's business activities occur in Utah." J.A., Vol. 1 at 54. This statement is conclusory. We therefore construe it simply as an introductory statement to the specific statements that follow. We do not take it to mean, as XMission argues, that Fluent disclaims having any customers in Utah.

[2] XMission also brought suit against four other entities (The Affiliati Network, Agora Financial, Above All Offers Corporation, and 9 Four One Media) but voluntarily dismissed them from the litigation. Because one of the dismissals was without prejudice,

XMission's claims for lack of personal jurisdiction. The district court granted the motion, holding that it lacked both general jurisdiction and specific jurisdiction over Fluent. We have jurisdiction to hear this appeal under 28 U.S.C. § 1291 and affirm.

## II. Discussion

### A. *Standard of Review*

We review de novo the district court's dismissal for lack of personal jurisdiction. *See Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). The plaintiff has the burden of establishing personal jurisdiction. *See OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998). "Where, as in the present case, there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). That is, the plaintiff may defeat a motion to dismiss by presenting evidence (either uncontested allegations in its complaint or other materials, or an affidavit or declaration) "that if true would support jurisdiction over the defendant." *OMI Holdings*, 149 F.3d at 1091.

### B. *Personal Jurisdiction*

A federal court may not exercise personal jurisdiction over an out-of-state defendant unless (1) an applicable statute authorizes service of process on that defendant and (2) the exercise of statutory jurisdiction comports with constitutional due process.

---

the district court directed entry of its dismissal of Fluent as a final judgment under Federal Rule of Civil Procedure 54(b).

7

*See Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). The parties agree that the only applicable statute is Utah's long-arm statute, Utah Code Ann. § 78B-3-201(3) (West 2019), which confers jurisdiction "to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." *See Fenn v. Mleads Enters., Inc.*, 137 P.3d 706, 710 n.10 (Utah 2006) (addressing Utah long-arm statute before it was recodified). The two-step analysis thus collapses here into a single due-process inquiry. *See Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009).

The Due Process Clause of the Fourteenth Amendment "constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014). For a court "to exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1070 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). That is, the contacts with the forum State must be such that the defendant "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Personal jurisdiction can be acquired through either general jurisdiction or specific jurisdiction. *See Shrader*, 633 F.3d at 1239. A person is subject to general jurisdiction within a State if its contacts with the State are so "continuous and systematic" that the person is essentially at home in the State. *Old Republic*, 877 F.3d at 904 (internal quotation marks omitted). In that

8

circumstance, the state courts may exercise jurisdiction over the person for any lawsuit. *See id.* at 903–04.

Specific jurisdiction, by contrast, allows a court to exercise jurisdiction over an out-of-state defendant only for claims related to the defendant's contacts with the forum State. *See Old Republic*, 877 F.3d at 904. "Specific jurisdiction . . . is premised on something of a *quid pro quo*: in exchange for 'benefitting' from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts." *Dudnikov*, 514 F.3d at 1078. XMission challenges only the district court's adverse ruling on specific jurisdiction.

Specific jurisdiction is proper if (1) the out-of-state defendant "purposefully directed" its activities at residents of the forum State, and (2) the plaintiff's alleged injuries "arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks omitted). The arising-out-of component of the test requires courts to ensure that there is an adequate link between the forum State and the claims at issue, regardless of the extent of a defendant's other activities connected to the forum. *See Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1781 (2017).

Even if the plaintiff satisfies the above two requirements, the defendant can defeat jurisdiction by presenting a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477. Unreasonableness is assessed by considering "(1) the burden on the defendant, (2) the forum State's interest in resolving the dispute, (3) the plaintiff's interest in receiving

9

convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies." *Old Republic*, 877 F.3d at 909 (internal quotation marks omitted).

The parties' briefs focus on whether XMission established purposeful direction. Purposeful direction (sometimes referred to as purposeful availment, *see Old Republic*, 877 F.3d at 904 n.11) requires that a defendant have "deliberately . . . engaged in significant activities within" the forum State or deliberately directed its activities at the forum State, so that it has "manifestly availed [itself] of the privilege of conducting business there." *Old Republic*, 877 F.3d at 905 (internal quotation marks omitted). Purposeful direction is a product of both the quantity and quality of a defendant's contacts with the forum. *See OMI Holdings*, 149 F.3d at 1092. The requirement "ensures that a defendant will not be subject to the laws of a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1058 (10th Cir. 2008) (internal quotation marks omitted), "the unilateral activity of another party or a third person," *id.* (internal quotation marks omitted), or the mere foreseeability that its actions may cause injury in that jurisdiction, *see Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1534 (10th Cir. 1996).

Although the goal of the purposeful-direction requirement is clear, deciding how to apply it can be difficult. We have observed that the requirement "can appear in different guises" across legal contexts, "is more aspirational than self-defining," and lacks predictability and certainty—and that, as a result, "courts have often retreated to

10

analogizing individual cases to discrete Supreme Court personal jurisdiction precedents." *Dudnikov*, 514 F.3d at 1071. This process has led to the development of several frameworks that focus the analysis in certain recurring types of situations to help determine whether purposeful direction has been established. *See Old Republic*, 877 F.3d at 905, 909 n.21 (identifying four frameworks). XMission argues that it has established purposeful direction under two of those frameworks: harmful effects in the forum State (the harmful-effects framework) and exploitation of the forum-State market (the market-exploitation framework).

We conclude that, under the barebones facts presented by XMission, both of its arguments fail.

### 1.        Harmful Effects

"Purposeful direction may. . . be established . . . when an out-of-state defendant's intentional conduct targets and has substantial harmful effects in the forum state." *Old Republic*, 877 F.3d at 907. The plaintiff must show "(a) an intentional action that was (b) expressly aimed at the forum state with (c) knowledge that the brunt of the injury would be felt in the forum state." *Id*. (ellipses, punctuation, and internal quotation marks omitted); *accord Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1231 (10th Cir. 2020) (rejecting specific jurisdiction over fraud claim)

Three opinions from the Supreme Court illustrate what suffices and what does not suffice to satisfy these elements. *Calder v. Jones*, 465 U.S. 783 (1984), addressed what it means to expressly aim action at a specific State. In *Calder*, Florida-based defendants wrote and edited an allegedly libelous *National Enquirer* article regarding the "California

11

activities of a California resident," actress Shirley Jones. *Id.* at 788; *see id.* at 784–85. The article "impugned the professionalism of an entertainer whose television career was centered in California." *Id.* at 788. The writer made phone calls and visits to California to obtain the information contained in the article, though the research, writing, and editing occurred largely in Florida. *See id.* at 785–86 & n.3. The Court held that specific jurisdiction in California was appropriate because the defendants' "intentional conduct in Florida [was] calculated to cause injury to [Jones] in California." *Id.* at 791. As the Court explained, "California [was] the focal point both of the story and of the harm suffered." *Id. at* 789. The defendants wrote and edited an article "drawn from California sources, and the brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788–89. Moreover, the defendants "knew [the article] would have a potentially devastating impact upon [Jones] [, and] they knew that the brunt of that injury would be felt by [Jones] in [California,] in which she live[d] and work[ed] and in which the National Enquirer ha[d] its largest circulation." *Id.* at 789–90

In contrast, the Supreme Court rejected personal jurisdiction in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 288. In that case a married couple purchased a new car in New York from a New York retail dealer, and in the following year decided to move their family to Arizona in the car. As they were driving through Oklahoma, they had a fiery accident that severely burned several members of the family. *See id*. The couple brought a products-liability action in Oklahoma against the car dealer and its New York-based wholesaler. *See id*. The Supreme Court held that there was no jurisdiction

12

over the dealer or wholesaler because neither defendant had any connection with Oklahoma other than that a single vehicle they had sold was involved in an accident while passing through that State—an "isolated" and "fortuitous" circumstance brought about by the plaintiffs' unilateral action. *Id.* at 295; *see id.* at 298; *see also id.* at 295 (neither defendant had made any sales in, performed services in, or advertised in Oklahoma, and there was no evidence that any other cars of theirs had ever entered Oklahoma). Even though "an automobile is mobile by its very design and purpose," perhaps making it "foreseeable" to the defendants that one of their cars could travel to and cause injury in Oklahoma, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Id.* at 295*; see id.* at 296 ("If foreseeability were the criterion, . . . [e]very seller of chattels would in effect appoint the chattel his agent for service of process."); *Calder*, 465 U.S. at 789 ("The mere fact that [the defendants could] foresee that the article [would] be circulated and have an effect in California is not sufficient for an assertion of jurisdiction." (internal quotation marks omitted)).

The Supreme Court also held that personal jurisdiction was lacking in *J. McIntyre Machinery, Ltd. v. Nicastro*, where a foreign manufacturer sold metal-shearing machines through an independent U.S. distributor with a "nationwide distribution system that might lead to those products being sold in any of the fifty states." 564 U.S. 873, 877 (2011) (plurality opinion of Kennedy, J.) (internal quotation marks omitted). Though the manufacturer had never marketed in or shipped its products to New Jersey, four of its machines ended up in the State and one injured the plaintiff there. *See id.* at 878. The

plurality opinion for four Justices reasoned that jurisdiction in New Jersey courts did not comport with due process because the manufacturer had no contacts with New Jersey other than the machine in question, *see id.* at 886, and therefore could not be said to have targeted the forum, *see id.* (although the defendant's distribution system and marketing efforts at trade shows in other States "may reveal an intent to serve the U.S. market, . . . they do not show that [the defendant] purposefully availed itself of the New Jersey market"). The plurality explained, "As a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* at 882. The concurring opinion for two Justices hesitated to adopt a broad rule limiting jurisdiction only to such "targeted" circumstances, *id.* at 890 (Breyer, J., concurring) (internal quotation marks omitted), instead focusing on how the Court's precedents had never found that "a single isolated sale" into the forum sufficed for personal jurisdiction, "even if that defendant place[d] his goods in the stream of commerce, fully aware (and hoping) that such a sale [would] take place." *Id.* at 888–89. The concurrence agreed with the plurality opinion in rejecting the notion that a producer could be "subject to jurisdiction for a products-liability action so long as it knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states." *Id.* at 891 (internal quotation marks omitted). Thus, six Justices emphasized that personal jurisdiction did not exist simply because of a defendant's awareness that its products could, through the stream of commerce, end up in the forum State.

14

This court has followed the Supreme Court in requiring a particular focus by the defendant on the forum State to satisfy the purposeful-direction requirement. Three of our prior opinions involving the Internet are especially illustrative of how we apply the requirement in different factual situations. In the first two we held that there was personal jurisdiction. But in the third, which is the most recent and most relevant to the circumstances here, we held that the plaintiff had not satisfied his burden of establishing personal jurisdiction.

In *Intercon, Inc. v. Bell Atlantic Internet Solutions., Inc.*, 205 F.3d 1244, 1246 (10th Cir. 2000), the defendant, a Delaware-based ISP, offered dial-up Internet service to customers in the northeastern and mid-Atlantic United States. "Because of certain provisions of the Telecommunications Act of 1996, defendant was not permitted to carry telephone transmissions across regional boundaries, but was required instead to use a global service provider to transmit the e-mail messages and Internet traffic." *Id.* The suit arose because defendant routed email traffic from about 12,000 of its customers through the email server of the plaintiff, an Oklahoma-based ISP, without authorization. *See id.* The unauthorized traffic caused a severe slow-down in the processing ability of plaintiff's email server. *See id.* The plaintiff brought suit in Oklahoma, a forum where the defendant conducted no business. *See id.* The unauthorized routing on the plaintiff's server began inadvertently (the defendant mistakenly used the plaintiff's domain name, which was similar to the domain name of one of the service providers the defendant used to route customer Internet dial-up services). *See id.* But the plaintiff alleged in an affidavit that the defendant continued to route traffic through the plaintiff's server for

15

several months after the plaintiff had contacted it regarding the routing error and the defendant had advised that it was aware of the problem. *See id*. On appeal from the dismissal of the action for lack of personal jurisdiction, we reversed. *See id.* at 1247–49. Although the assertions in the plaintiff's affidavit were disputed, we held that the plaintiff had made a sufficient showing to establish personal jurisdiction on the ground that the defendant had purposefully directed its online conduct toward Oklahoma with knowledge of the harmful effects there. *See id*. at 1247–48.

In *Dudnikov* the plaintiffs, a Colorado couple who sold fabric prints from their home using the eBay auction website, sought a declaratory judgment in Colorado to establish that one of their prints did not infringe copyrights belonging to out-of-state defendants. *See* 514 F.3d at 1067. The defendants had sent a copyright-infringement notice to eBay in California with the specific intent of halting the plaintiffs' scheduled auction of the allegedly infringing items. *See id at* 1067–69. eBay then cancelled the auction. *See id.* at 1069. In response to the complaint, the defendants moved to dismiss for lack of personal jurisdiction, and the district court granted the motion. *See id.* at 1067–68. We reversed, concluding that Colorado could exercise personal jurisdiction because of the evidence that the defendants acted with the ultimate purpose of impacting the plaintiffs' business in the State. *See id.* at 1075. The record evidence (including the plaintiffs' eBay auction page, which clearly disclosed their Colorado location, *see id.* at 1068) supported the claim that the defendants *knew* that the plaintiffs' business was located in Colorado. *See id.* at 1076. Even though the infringement notice "formally traveled only to California," it was still "an intended means to the further intended end of

16

cancelling plaintiffs' auction in Colorado." *Id.* at 1075. We compared what happened to "a bank shot in basketball . . . [where a] player who shoots the ball off of the backboard intends to hit the backboard, but he does so in the service of his further intention of putting the ball into the basket." *Id.* Defendants sent the notice to California with the "express aim . . . to halt a Colorado-based sale by a Colorado resident." *Id.* at 1076.

*Intercon* and *Dudnikov*, however, had no occasion to address some of the more problematic issues that arise from trying to base personal jurisdiction on use of the Internet for mass marketing to unidentified persons. Although *Intercon* involved Internet traffic, the defendant knew it was improperly using a server located in the forum State. Similarly, in *Dudnikov*, although the defendant used email, there was nothing qualitatively different between the email in that case and a physical letter except the promptness of delivery. *See Shrader*, 633 F.3d at 1241 n.4 (observing that personal jurisdiction in *Dudnikov* "was based on [] direct commercial action by the defendant, not on an indiscriminately accessible web site, forum posting, or mass email" and thus "did not present an occasion to settle on an approach to personal jurisdiction in the latter, uniquely internet circumstances"). The unique aspect of the Internet that creates challenging issues regarding personal jurisdiction is that in the mass-marketing Internet context the marketer ordinarily does not know the physical location of the recipient of the message. The Supreme Court has only alluded to these issues, "leav[ing] questions about virtual contacts [via the Internet] for another day." *Walden*, 571 U.S. at 290 n.9. Thus, for now, development of personal-jurisdiction law in the Internet context has been left to the lower courts. *Cf.* 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 1073 at 494 & n.16 (4th ed. 2015) (Wright & Miller) ("New appellate precedents are constantly appearing, showing the subject [of personal jurisdiction and website operation] is still in a state of flux.") .

This court's leading opinion in that context is *Shrader*. In *Shrader* we observed that Internet activities such as mass emailing, website hosting, and Internet posting are "peculiarly non-territorial" because "the internet operates 'in' every state regardless of where the user is physically located," 633 F.3d at 1240, and "when a person places information on the Internet, he can communicate with persons in virtually every jurisdiction," *id.* (internal quotation marks omitted). We cautioned that if courts are to conclude that, as a general matter, "a person's act of placing information on the Internet subjects that person to personal jurisdiction in each State in which the information is accessed"—essentially subjecting them to nationwide jurisdiction—"then the defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist." *Id.* (internal quotation marks omitted). *Shrader* explained that therefore "it is necessary to adapt the analysis of personal jurisdiction to this unique circumstance by placing emphasis on the internet user or site intentionally directing his/her/its activity or operation at the forum state rather than just having the activity or operation accessible there." *Id.*

In particular, *Shrader* instructs that we are to examine whether the defendant "deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id.* at 1241 (emphases added). But *see Old Republic*, 877 F.3d at 917 n.35 ("[T]he 'intending harm' language in

18

Shrader" should not be taken "literally to mean that the defendant must actually intend to harm forum state residents . . . . We instead ask whether the defendant intended its online content to create effects specifically in the forum state.").

Addressing websites such as Internet forums, we said that "merely posting information on the internet does not, in itself, subject the poster to personal jurisdiction wherever that information may be accessed. . . . Rather, . . . postings may give rise to personal jurisdiction if they are directed specifically at a forum state audience or otherwise make the forum state the focal point of the message." *Shrader*, 633 F.3d at 1244. We distinguished our unpublished decision in *Silver v. Brown*, 382 F. App'x 723 (10th Cir. 2010), which found purposeful direction for the defendant's derogatory blog post that adversely affected the plaintiff in New Mexico, where the plaintiff's venture-capital business was centered, because the defendant created the blog specifically to launch his attack on the plaintiff's business and to target a substantial number of New Mexico residents, *see Shrader*, 633 F.3d at 1245 (names of plaintiff and his business were incorporated in blog's domain name, and defendant used search-engine technology to funnel searches regarding plaintiff and his business to the blog).

With respect to mass emails, *Shrader* counsels that specific jurisdiction is proper over a sender only if the plaintiff shows that the sender had knowledge that the offending emails were going to a specific State:

> Although email is directed to particular recipients, email addresses typically do not reveal anything about the geographic location of the addressee. Thus, *if the plaintiff does not show that the defendant otherwise knew where the recipient was located, the email itself does not demonstrate purposeful direction* of the message to the forum state, even if that happens

19

to be where the recipient lived.

*Id.* at 1247–48 (emphasis added).

*Shrader* applied these principles to reject specific jurisdiction in Oklahoma over an out-of-state book publisher that sent a mass email with allegedly defamatory content regarding the plaintiff, an Oklahoma author with whom the publisher had just ceased doing business. *See id*. at 1237–38. The author alleged that the publisher sent the email via a distribution list "to thousands of customers and knew that some of them resided in Oklahoma." *Id.* at 1248. But the publisher submitted an affidavit averring that he did not send the email to all his customers and that he did not send the email to anyone in Oklahoma. *See id.* The plaintiff made no showing to contradict this affidavit: he "did not submit any evidence, or even offer the name, of a single Oklahoma resident who received the email from [the publisher]." *Id.* Although an Internet forum post by an email recipient suggested that the publisher's email was delivered in a bulk fashion to multiple customers, we concluded that this wide distribution "d[id] not indicate that any of the recipients resided in Oklahoma, much less that [the publisher] knew they resided there when he sent the email." *Id.; see also id.* at 1245–46 (Oklahoma also lacked specific jurisdiction over out-of-state defendant who posted allegedly defamatory email to an Internet forum in response to an inquiry from another forum member, since nothing about the online forum, the inquiry that prompted the email posting, the defendant, or the email content itself had any connection with Oklahoma). Other courts have adopted a similar approach. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) (personal jurisdiction requires more than "simply

20

operating an interactive website accessible in the forum state and sending emails to people who may happen to live there"); *Fenn*, 137 P.3d at 714 (in a CAN-SPAM suit, no purposeful availment where defendant "lacked knowledge of the exact [geographic] location to which" another company, contracted to advertise defendant's services through email solicitations, would send a marketing email, *see id.* at 709). *But see Ferron v. Echostar Satellite, LLC*, No. 2:06-CV-00453, 2008 WL 11451432, at *4 (S.D. Ohio Sept. 5, 2008) (citing contrary cases).

*Shrader* resolves the issue before us. Like the *Shrader* plaintiff, XMission has not made any showing that Fluent *knew* that any email recipient resided in Utah. Although XMission has alleged that Fluent "was responsible for at least 10,141 emails," J.A., Vol. 1 at 14, it has offered no evidence "through specific averments, verified allegations, or other evidence sufficient to create a genuine issue of fact," *Shrader*, 633 F.3d at 1248, to contravene Barsky's statement that Fluent "does not see the emails before they are sent by the publishers; know where (i.e., the location or the recipient) the publishers send the emails; or decide the customers to whom the publishers should publish the emails." J.A., Vol. 1 at 53. In *Intercon* and *Dudnikov*, by contrast, each plaintiff made a sufficient showing that defendants knew of the plaintiff's presence in the forum State and intentionally targeted the plaintiff there. In *Intercon* there was evidence that the defendant-ISP knowingly used plaintiff's email server in the forum State without authorization. *See* 205 F.3d at 1247–48. And in *Dudnikov* the plaintiffs sufficiently showed in their complaint and through the record evidence that defendants sent the

21

copyright infringement notice to eBay for the express purpose of cancelling the auction by a Colorado business. *See* 514 F.3d at 1075–76.

None of XMission's arguments to the contrary is persuasive. First, XMission argues that Fluent must have known that some of the offending emails were going to Utah because it was aware, based on its business model of compensating publishers for each "triggering event," that the publishers had an incentive to send emails to as many people in as many places as possible. But allowing that kind of nonspecific "knowledge" to serve as the basis for specific jurisdiction is inconsistent with what we said in *Shrader*. *See* 633 F.3d at 1248 ("[I]f the plaintiff does not show that the defendant otherwise knew where the recipient was located, the email itself does not demonstrate purposeful direction of the message to the forum state, even if that happens to be where the recipient lived."). General knowledge that a message will have a broad circulation does not suffice. *See id.* at 1240 ("If we were to conclude as a general principle that a person's act of placing information on the Internet subjects that person to personal jurisdiction in each State in which the information is accessed, then the defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist. The person placing information on the Internet would be subject to personal jurisdiction in every State." (internal quotation marks omitted)); *see also Nicastro*, 564 U.S. at 877, 891 (both the plurality and concurring opinions reject jurisdiction even if defendant "kn[ew] or reasonably should [have] know[n] that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states" (internal quotation marks omitted)). Purposeful direction cannot be satisfied

if the website host, web poster, or email sender simply wants as many responses as possible but is indifferent to the physical location of the responder.

XMission also argues that specific jurisdiction over Fluent can be based on the conduct of its publishers because "Fluent's contacts with Utah were *intertwined* with its interactions with the third-party publisher[s]." Aplt. Br. at 18 (emphasis added). This argument is based on a misunderstanding of a passage in the Supreme Court's opinion in *Walden*. The Court wrote:

> [The] plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him. To be sure, *a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties*. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State.

*Walden*, 571 U.S. at 285–86 (emphasis added) (citations and internal quotation marks omitted).

As we understand this passage, the Court was *not* saying that personal jurisdiction can be based merely on contacts with the State by third persons whose activities are in some way intertwined with those of the defendant. Rather it is saying that jurisdiction must be based on the conduct of the defendant itself. The "intertwined" sentence simply points out that the defendant's contacts with the State may sometimes be contacts of the defendant that involve the plaintiff or other parties. In other words, courts will not refuse to consider a contact of the defendant with the State simply because it was "intertwined

23

with [the defendant's] transactions or interactions with the plaintiff or other parties." *Id.*
at 286; *see MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 900 (6th Cir. 2017)
(similarly interpreting the "intertwined" passage in *Walden*). We do not foreclose the
possibility that jurisdiction over a defendant could be based solely on activities of its
agents. But that possibility is irrelevant to this case because XMission has not challenged
the district court's determination that the publishers were not agents of Fluent. *See*
*Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 459 (10th Cir. 1996) (court
will not impute to defendant various contacts with forum State by non-agent).

In a related argument, XMission suggests that the backboard analogy of *Dudnikov*
applies, with the publishers acting as a backboard for Fluent (the basketball player) in
sending emails to the Utah market. But in *Dudnikov* the defendant (the basketball player)
had focused on the forum-state recipient of its actions (the basket) and sent the notice (the
basketball) to eBay (the backboard) with the intent that it ricochet to Colorado. Here, in
contrast, XMission has not identified any potential persons in Utah (the basket) that
Fluent was specifically trying to contact (with or without the aid of an intermediary
publisher (the backboard)).

XMission also argues that it is fair to subject Fluent to personal jurisdiction in
Utah because the CAN-SPAM Act warned it that it could be haled into court in that
jurisdiction. *See World-Wide Volkswagen*, 444 U.S. at 297 (the contacts with the forum
State must be such that the defendant "should reasonably anticipate being haled into court
there"). It states:

24

> The CAN-SPAM Act provided Fluent with notice that it could be haled into any forum where its marketing campaign emails were sent. The CAN-SPAM Act expressly provides notice to email marketing companies that internet service providers may bring claims for CAN-SPAM Act violations even when the marketing company has procured the initiation of emails while consciously avoiding knowledge of whether the third party publisher engages in practices that violate the Act. 15 U.S.C. § 7706(g)(2). Congress also provided notice of potential CAN-SPAM Act liability for any company that hires a third party to assist in an email marketing campaign: "more than one person may be considered to have initiated a message. Thus, if one company hires another to handle the tasks of composing, addressing, and coordinating the sending of a marketing appeal, both companies could be considered to have initiated the message—one for procuring the origination of the message; the other for actually originating it." S. Rep. No. 108-102, at 15 (2003); 15 U.S.C. § 7702(9), (16).

Aplt. Br. at 20–21. But what the statute does is merely alert those who have others send emails that they may be subject to liability for the acts of others. It says nothing about what forums have personal jurisdiction over the sender to litigate that potential liability. XMission has "confuse[d] the standards applicable to personal jurisdiction and those applicable to liability." *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007).

XMission further argues that Fluent had to know that its emails were going to Utah because it reported receiving so much revenue (about $3 million) from Utah during the roughly three-year timespan that the offending emails were sent. But the record does not indicate in what way the revenue could be said to have come from Utah. The Utah revenue may well have come from merchants in Utah who wanted to increase sales in other states and therefore purchased Fluent's services. It is pure speculation to suggest that Fluent's receipt of revenue from Utah came from recipients of the offending emails or that the revenue in any way gave it knowledge of the geographic location of specific recipients of any of the offending emails.

25

Finally, XMission argues that Fluent learned from this lawsuit about other emails being sent by publishers to residents of Utah after the complaint was filed. But none of the claims in the complaint are based on those later emails, and XMission did not seek leave to amend its complaint. Even if XMission could show that Fluent was later intentionally directing to Utah some email similar to the offending emails (and therefore might be subject to personal jurisdiction in Utah regarding such emails), XMission cannot leverage that personal jurisdiction to obtain personal jurisdiction over Fluent to litigate liability with respect to the earlier emails. *See Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987) ("[C]ourts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction."); 16 James Wm. Moore et al., Moore's Federal Practice §108.42[2][a], at 108-55 to 108-56 (3d ed. 2011) ("The proper focus in the specific jurisdiction analysis is on those contacts leading up to and surrounding the accrual of the cause of action. Later events are not considered."); Christian E. Mammen, *Here Today, Gone Tomorrow: The Timing of Contacts for Jurisdiction and Venue Under 28 U.S.C. § 1391*, 78 Cornell L. Rev. 707, 719 (1993) ("The only way a claim can 'arise out of' the defendant's contacts is if those contacts exist prior to or simultaneously with the accrual of the claim. A claim cannot be said to arise out of contacts that did not exist until after the claim arose."); *id. at* 721 ("Specific jurisdiction deals with a defendant's contacts with a forum at the time the claim accrues.").[3]

---

[3] There is some dispute about whether to consider, for specific-jurisdiction purposes, any contacts up to the time the claim accrued, or until suit was filed, or until the complaint

We conclude that there is not personal jurisdiction under the "Harmful Effects" test. *See Zoobuh, Inc. v. Williams*, No. 2:13-CV-791 TS, 2014 WL 7261786 (D. Utah, Dec. 18, 2014) (reaching same conclusion on similar facts).

### 2.     Market Exploitation

XMission also argues that the district court had personal jurisdiction over Fluent under a market-exploitation theory.  We have held that a defendant purposefully directs activities into the forum State if it continuously and deliberately exploits the forum State's market.  *See Old Republic*, 877 F.3d at 905–06.  "Factors suggesting purposeful direction based on forum state market exploitation include:  (a) high sales volume and large customer base and revenues and (b) extensive nationwide advertising or ads targeting the forum state."  *Id.* at 915.

XMission focuses its market-exploitation argument on the $3 million in revenue from Utah customers apparently received by Fluent during the period that the offending emails were sent.  But even if that revenue establishes purposeful direction (an issue we need not resolve), XMission had to provide adequate evidence of the remaining requirement for specific jurisdiction—namely, that its alleged injuries "arise out of or relate to those activities."  *Burger King*, 471 U.S. at 472 (internal quotation marks omitted).  In other words, XMission had to show that Fluent's $3 million in Utah revenue reflected a sufficient "affiliation between the forum and the underlying controversy."

---

was served.  *See* 4A Wright & Miller § 1069 at 126–27. This circuit has not weighed in on the debate.  And we need not resolve the issue here, as XMission's argument is based on contacts after the complaint was filed and then served two days later.

27

*Bristol-Myers Squibb*, 137 S. Ct. at 1780 (internal quotation marks omitted). It failed to do so.

To begin with, the district court ruled that XMission had not "shown in its submissions than any of [the $3 million in] revenue is connected in any way to Fluent's conduct which forms the basis for the allegations in the complaint and the claims that are asserted in this case. In fact, as [XMission] candidly acknowledged in argument[,] nobody knows the source of those revenues from Utah for Fluent, at least not on the record before us." J.A., Vol. 3 at 656. We agree with the district court.

XMission argues that the $3 million must have arisen from the offending emails because "Fluent disavows any other business activity in the forum." Aplt. Br. at 23. We are not persuaded. For one thing, there is no evidence in the record that Fluent obtained any revenue from any of the offending emails. Perhaps (although nothing in the record supports this) Fluent receives some money from the companies whose names appear in the emails when a recipient of the email purchases an advertised product or service from one of the companies (publishers are compensated by Fluent if this occurs). But there is no evidence that any recipient of the offending emails made such a purchase. And even if it might suffice for personal jurisdiction if Fluent earned significant revenue by selling consumer data obtained from recipients of offending emails who entered their personal data (an issue we need not decide), there is nothing in the record indicating that even one recipient of the offending emails provided such information, or even opened an email and clicked on the contained link.

XMission ignores the screenshot of Fluent's website that it placed in the record. The customers solicited by the website are clearly businesses that have a product or service to sell. Those customers pay for Fluent's services in helping them market what they have to offer. Thus, it is more than plausible, and fully consistent with the record before us, that the $3 million in revenue from Utah came from a source unrelated to this suit: Utah businesses who decided to obtain Fluent's services to expand their markets.

We therefore reject the argument that personal jurisdiction over Fluent in this case can be based on Fluent's $3 million in revenue from Utah customers. *See Madara v. Hall*, 916 F.2d 1510, 1518 (11th Cir. 1990) (Florida courts lacked jurisdiction over an out-of-state musical entertainer in a libel suit because defendant's exploitation of the Florida market through recording sales and concert performances had no relation to the alleged libel uttered in New York).

XMission also argues that personal jurisdiction can be based on Fluent's advertising. It refers to the emails delivered through its servers as part of an extensive advertising campaign by Fluent. But the emails did not market Fluent's services. There is no evidence that they were designed to attract customers for Fluent or in fact did so. Moreover, for the reasons given in the prior section of this opinion, the emails could not be said to "target[] the forum state." *Old Republic*, 877 F.3d at 915 (describing one factor under the market-exploitation theory as "extensive nationwide advertising or ads targeting the forum state"). We are not persuaded that the offending emails created personal jurisdiction over Fluent in Utah under the advertising component of the market-exploitation theory.

29

**III.   Conclusion**

We **AFFIRM** the district court's order dismissing XMission's suit against Fluent for lack of personal jurisdiction.