FILED
United States Court of Appeals
Tenth Circuit

June 28, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

XMISSION, L.C., a Utah company,

    Plaintiff – Appellant,

v.

    No. 23-4001

PUREHEALTH RESEARCH, a
Virginia business entity,

    Defendant – Appellee.

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:21-CV-00734-TS)**

_____

John J. Nielsen, Lee|Nielsen, Salt Lake City, Utah (Thomas R. Lee, Lee|Nielsen, Salt Lake City, Utah, Gregory Phillips, Salt Lake City, Utah, and Jordan Cameron, Cottonwood Heights, Utah, with him on the briefs), for Plaintiff-Appellant.

Scarlet R. Smith, Strong & Hanni, Sandy, Utah (H. Scott Jacobson, Strong & Hanni, Sandy, Utah, with her on the brief), for Defendant-Appellee.

_____

Before **MORITZ**, **EBEL**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN,** Circuit Judge.

_____

This case presents a variation on the theme of personal jurisdiction. Appellant XMission, L.C. is an internet service provider based in Utah. Appellee PureHealth Research is a Wyoming LLC that sells nutritional supplements through its website. XMission sued PureHealth in federal district court in Utah, claiming XMission's customers in Utah received thousands of unwanted promotional emails from PureHealth—allegedly in violation of state and federal law—resulting in increased server maintenance costs and customer complaints. PureHealth moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of specific personal jurisdiction, contending it lacked sufficient contacts with Utah and the lawsuit did not "arise out of or relate to" its forum conduct. The district court granted the motion.

This appeal asks whether PureHealth must defend this lawsuit in Utah where the record establishes it knowingly sent marketing emails to XMission's customers in Utah. The answer is yes. Although this case has some distinctively modern features, it is readily resolved by long-standing legal principles. Exercising appellate jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings.

**I**[1]

**A**

XMission provides high-speed internet, cloud and web hosting, and email services to customers in Utah. XMission's infrastructure—its servers, routers, and switches—is in Utah. Through its terms of service, XMission can opt out of unwanted "spam" emails on behalf of its customers.[2] And XMission's customers assign "the right to pursue claims arising from the receipt of spam emails to XMission." App. at 22, ¶ 75.

PureHealth is incorporated in Wyoming and has its principal place of business in Virginia. It formulates and manufactures nutritional supplements and sells those products nationwide through its website. PureHealth uses two kinds of promotional emails to advertise its products. First, PureHealth creates and sends direct marketing emails from its own domain names to recipients who have done business with PureHealth and have not opted out of receiving

---

[1] We take the facts recited here from XMission's complaint and the record on PureHealth's motion to dismiss, including the information developed in jurisdictional discovery. *See generally Sizova* v. *Nat. Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002) ("When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." (quoting *Budde* v. *Ling-Temco Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975))).

[2] According to XMission, "spam" means "unlawful commercial email." App. at 12, ¶ 18. PureHealth does not dispute XMission's definition of "spam."

3

the emails. These communications are known as "newsletter emails." PureHealth collects data about where the newsletter emails are sent, including the recipient's name, email address, physical address, and IP address. Over 90 percent of "the traffic" on PureHealth's website comes from the newsletter emails. App. at 91–92.

Second, PureHealth works with advertising networks who use independent third-party partners to create and send promotional emails to potential PureHealth customers. These are known as "affiliate emails." *See* App. at 43, 92, 97. PureHealth does not hire the affiliates or have control over their actions. PureHealth provides the advertising networks with the promotional information it wants distributed, with "certain guidelines that are to be followed," and "[t]he advertising networks th[e]n use the affiliates to actually generate and send the emails." App. at 43. PureHealth also gives the advertising networks the subject headings for the affiliate emails.

PureHealth sent hundreds of newsletter emails and thousands of affiliate emails to XMission's customers in Utah.

**B**

In December 2021, XMission sued PureHealth in federal court in the District of Utah.[3] XMission claimed PureHealth's advertising emails—both

---

[3] XMission also sued 10 unknown advertising affiliates PureHealth allegedly used to advertise its products. These defendants are not relevant

4

the newsletter emails and the affiliate emails—violated the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), 15 U.S.C. §§ 7701 to 7713.[4] According to XMission, PureHealth's advertising emails contained materially false or misleading subject headings, which impaired XMission's ability to process the emails on its servers and were "designed merely to induce the recipient to open the email under false pretenses." App. at 19, ¶ 56. And XMission claimed PureHealth did not honor customer opt-out requests within 10 business days, as the CAN-SPAM Act requires. XMission also alleged PureHealth violated Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, by misrepresenting its products in its promotional emails. According to XMission, the sheer number of PureHealth's "spam" emails on its servers increased its maintenance and storage costs, generated many customer complaints, and generally tarnished its goodwill.

---

to the specific jurisdiction question on appeal because the only issue before us is whether *PureHealth* is subject to personal jurisdiction in Utah.

[4] The CAN-SPAM Act regulates commercial emails. *See* 15 U.S.C. § 7704; *see also id.* § 7701(a)(3), (b)(2) (explaining Congress passed the CAN-SPAM Act because the "receipt of unsolicited commercial electronic mail may result in costs . . . for the storage of such mail" and "senders of commercial electronic mail should not mislead recipients as to the source or content of such mail").

PureHealth moved to dismiss for lack of specific personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). PureHealth argued it did not have the requisite contacts with Utah and asserted it would be "unfair and unreasonable" to require it to litigate in the state. App. at 29. PureHealth relied primarily on *XMission L.C.* v. *Fluent LLC*, 955 F.3d 833 (10th Cir. 2020), urging the district court to dismiss XMission's "claims . . . for lack of jurisdiction for all of the same reasons identified by the Tenth Circuit in *Fluent*." App. at 38. *Fluent* involved a lawsuit against an out-of-state company over spam advertising emails sent to Utah residents by third-party affiliate marketers. *Id.* at 837. The issue there, as here, was whether the defendant was subject to suit in Utah based on emails sent to residents in the state.[5] *See id.* at 839. In *Fluent*, we concluded "the barebones facts presented by XMission" did not suggest the defendant "*knew* that any email recipient resided in Utah," and thus, we could not say the defendant company purposefully directed its commercial business activities at Utah. *Id.* at 841, 846.[6]

---

[5] But, as we will soon explain, there are dispositive differences between this case and *Fluent*.

[6] *Fluent* involved only advertising emails sent by third-party affiliate marketers, and not, as here, both affiliate emails and emails sent directly by the defendant company to the forum state. *See Fluent LLC*, 955 F.3d at 837–38.

After PureHealth moved to dismiss, the district court—at XMission's request—allowed the parties to conduct jurisdictional discovery. Giedrius Cekanskis, PureHealth's owner and Chief Executive Officer, testified in his deposition about PureHealth's email advertising practices. Mr. Cekanskis confirmed PureHealth only sent newsletter emails "after [it] already [has] a full customer profile—name, address, physical address, phone number, IP address." App. at 100. Mr. Cekanskis further stated PureHealth "intentionally" sent newsletter emails to customers who previously purchased its products, including its former customers in Utah, and "specifically target[ed] those consumers in order to generate more sales." App. at 100. PureHealth also produced documents, including examples of the newsletter emails and a subscriber list with customer information. XMission submitted a declaration from Peter Ashdown, its founder and Chief Technical Officer, identifying "655 [newsletter emails] . . . sent directly from" PureHealth to XMission customers in Utah. App. at 223.

XMission opposed PureHealth's motion to dismiss. The evidence developed in jurisdictional discovery confirmed PureHealth not only sent promotional emails through affiliates but also knowingly created and sent newsletter emails directly to XMission's customers in Utah. In this way, XMission explained, PureHealth was unlike the defendant in *Fluent*, who

did not know that third-party affiliate marketers were sending promotional emails to Utah residents.

In reply, PureHealth did not dispute it knowingly sent the newsletter emails to XMission's customers in Utah. But PureHealth insisted specific personal jurisdiction was lacking because the newsletter emails were sent only to those Utah recipients who had opted-in to receiving them. PureHealth also argued XMission "failed to establish a prima facie case that its alleged injuries 'arise out of or relate to those' emails." App. at 234.

The district court granted PureHealth's motion to dismiss in a written order. This timely appeal followed.[7]

## II

The Federal Rules of Civil Procedure allow a defendant to move for dismissal of a complaint based on "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). "[P]ersonal jurisdiction is a *personal* defense that may be waived or forfeited." *Mallory* v. *Norfolk S. Ry. Co.*, 600 U.S. 122, 144 (2023). Here, PureHealth properly asserted the defense at the pleading stage. "[A]t this stage, plaintiffs need only make a *prima facie* showing of personal jurisdiction." *Dudnikov* v. *Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063,

---

[7] XMission moved for reconsideration, which the district court denied. That order is not on appeal.

1070 (10th Cir. 2008). Jurisdictional discovery was conducted in this case, and in considering the jurisdictional issue, the district court properly examined "discovery material as well as affidavits submitted by the parties." 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1067.6 (4th ed. 2023); *see also Kuan Chen* v. *United States Sports Acad., Inc.*, 956 F.3d 45, 56 (1st Cir. 2020) (stating "[i]t is clear beyond hope of contradiction that a district court confronted" with a Rule 12(b)(2) motion to dismiss can consider materials adduced during jurisdictional discovery).

"When, as here, personal jurisdiction is found wanting on the basis of the complaint and affidavits, our review of the district court's dismissal is *de novo*, taking as true all well-pled (that is, plausible, non-conclusory, and non-speculative) facts alleged in plaintiff['s] complaint." *Dudnikov*, 514 F.3d at 1070 (internal citation omitted). And "any factual disputes in the parties' affidavits must be resolved in plaintiffs' favor." *Id.*; *see also AST Sports Science, Inc.* v. *CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008) ("[T]he court is bound to resolve all factual disputes in favor of the plaintiff in determining whether he has made the requisite showing.").

With these standards in mind, we describe the applicable law, consider the parties' arguments, and explain why, in this case, Utah has specific personal jurisdiction over PureHealth.

9

## III

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden* v. *Fiore*, 571 U.S. 277, 283 (2014) (quoting *Daimler AG* v. *Bauman*, 571 U.S. 117, 125 (2014)). Utah authorizes its courts to exercise jurisdiction over "nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." Utah Code Ann. § 78B-3-201(3). "The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 291 (1980). "'[T]he constitutional touchstone' of the determination whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established "minimum contacts" in the forum State.'" *Asahi Metal Indus. Co., Ltd.* v. *Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 108–09 (1987) (quoting *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 474 (1985)); *see also World-Wide Volkswagen Corp.*, 444 U.S. at 297 (explaining the Due Process Clause was intended to "give[] a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit"). As the Supreme Court has summarized, "[a] tribunal's authority depends on the defendant's having such 'contacts' with the

10

forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co.* v. *Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *International Shoe Co.* v. *Washington*, 326 U.S. 310 (1945), which the Court said remains "[t]he canonical decision in this area").

There are two kinds of personal jurisdiction: "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Id.* A defendant subject to general jurisdiction allows a "court . . . [to] hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb Co.* v. *Superior Ct. of Cal., S.F.W Cnty.*, 582 U.S. 255, 262 (2017). "But 'only a limited set of affiliations with a forum will render a defendant amenable to' general jurisdiction in that State." *Id.* (quoting *Daimler AG*, 571 U.S. at 137). "Specific jurisdiction is very different" because for a court "to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Id.* (quoting *Daimler*, 571 U.S. at 127). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's

regulation.'" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 919 (2011)).

This is a specific jurisdiction case, as the parties agree. The specific-jurisdiction inquiry focuses on "the relationship among the defendant, the forum, and the litigation." *Daimler AG*, 571 U.S. at 126 (quoting *Shaffer* v. *Heitner*, 433 U.S. 186, 204 (1977)). "The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.'" *Ford Motor Co.*, 592 U.S. at 359. We have held "[s]pecific jurisdiction is proper if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'" *Fluent LLC*, 955 F.3d at 840 (quoting *Burger King Corp.*, 471 U.S. at 472).

On appeal, XMission urges reversal, contending PureHealth was subject to personal jurisdiction in Utah because it (1) purposefully directed its newsletter emails at Utah residents, and (2) XMission's claims arose out of or relate to those emails.[8]  On the record before us, we agree.

---

[8] XMission also argues there is specific personal jurisdiction based on the affiliate emails.  Because we conclude the newsletter emails provide a sufficient contact with the forum state to permit the exercise of specific personal jurisdiction, we need not also decide the jurisdictional import of PureHealth's affiliate emails.

12

## A

"Purposeful direction (sometimes referred to as purposeful availment) requires that a defendant have 'deliberately . . . engaged in significant activities within' the forum State or deliberately directed its activities at the forum State, so that it has 'manifestly availed [itself] of the privilege of conducting business there.'" *Id.* (internal citation omitted) (quoting *Old Republic Ins. Co.* v. *Cont'l Motors, Inc.*, 877 F.3d 895, 905 (10th Cir. 2017)). "Purposeful direction is a product of both the quantity and quality of a defendant's contacts with the forum." *Id.* This "requirement ensures that a defendant will not be subject to the laws of a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, the unilateral activity of another party or a third person, or the mere foreseeability that its actions may cause injury in that jurisdiction." *Id.* at 840–41 (internal quotations and citations omitted).

Our precedents reveal several frameworks for testing whether a defendant has purposefully directed its activities at the forum state. *See Old Republic Ins. Co.*, 877 F.3d at 904–08.[9] At issue here is the

---

[9] In *Old Republic Ins. Co.*, we identified three distinct purposeful-direction frameworks, each focusing on a particular aspect of a defendant's contacts with the forum state: (1) "continuing relationships with forum state residents"; (2) "deliberate exploitation of the forum state market"; and (3) "harmful effects in the forum state." 877 F.3d at 905–08. Before the district court, XMission relied on both the "deliberate

harmful-effects test from *Calder* v. *Jones*, 465 U.S. 783 (1984).[10] In a handful of precedents, we have applied this test to suits "involving the Internet." *Fluent LLC*, 955 F.3d at 843 (applying harmful-effects test to a

---

exploitation" and harmful-effects frameworks to establish PureHealth's purposeful-direction. On appeal, XMission focuses only on the harmful-effects test, and for that reason, so do we.

[10] *Calder* will be familiar to every first-year law student. That case involved an allegedly libelous magazine article about actress Shirley Jones, a California resident. *Calder*, 465 U.S. at 784–85, 788. The article's author and editor were Florida residents. *Id.* at 785. The author called sources in California "for the information contained in the article" and "[s]hortly before publication," called Ms. Jones's home and "read to her husband a draft of the article so as to elicit his comments upon it." *Id.* at 785–86. The editor for his part, had "been to California only twice," and both visits were unrelated to the article. *Id.* at 786. But the editor "approved the initial evaluation of the subject of the article and edited it in its final form." *Id.*

Ms. Jones sued the Florida defendants in California superior court for "libel, invasion of privacy, and intentional infliction of emotional harm" over claims made in the article. *Id.* at 785. The Florida defendants insisted there was no personal jurisdiction in California because "they [were] not responsible for the circulation of the article in California," had "no direct economic stake in their employer's sales in a distant State," and were unable "to control their employer's marketing activity." *Id.* at 789.

Ultimately, the Supreme Court approved the state court's exercise of personal jurisdiction. *Id.* at 791. The Court reasoned the "libelous story concerned the California activities of a California resident," impacted "the professionalism of an entertainer whose television career was centered in California," drew "from California sources, and the brunt of the harm, in terms both of [Ms. Jones's] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788–89. Importantly, the Court observed the Florida defendants "knew" the article "would have a potentially devastating impact" on Ms. Jones and "the brunt of that injury would be felt" in California. *Id.* at 789–90.

14

lawsuit involving spam emails sent by third-party publishers hired by the defendant); *Shrader* v. *Biddinger*, 633 F.3d 1235, 1240–41 (10th Cir. 2011) (applying harmful-effects test to a lawsuit involving, in part, an allegedly defamatory email posted on a blog); *Dudnikov*, 514 F.3d at 1072–78 (applying harmful-effects test to a lawsuit involving sales on eBay's auction website); *Intercon, Inc.*, v. *Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247–48 (10th Cir. 2000) (applying harmful-effects test to a lawsuit involving email traffic routed through email servers). Under the harmful-effects test, therefore, a plaintiff meets its *prima facie* burden by showing "an out-of-state defendant's intentional conduct targets and has substantial harmful effects in the forum state." *Fluent LLC*, 955 F.3d at 841 (quoting *Old Republic Ins. Co.*, 877 F.3d at 907). To demonstrate purposeful availment in the harmful-effects context, a plaintiff must allege the defendant committed "(a) an intentional action that was (b) expressly aimed at the forum state with (c) knowledge that the brunt of the injury would be felt in the forum state." *Id.* (internal quotations omitted).

There is no doubt PureHealth engaged in "an intentional action" by sending newsletter emails to XMission's customers in Utah. *Id.* at 841. PureHealth admits as much. We thus focus on whether PureHealth expressly aimed the newsletter emails at Utah residents, knowing that the brunt of the injuries alleged by XMission would be felt in the forum state.

15

According to the district court, XMission "failed to establish that PureHealth expressly aimed the newsletter emails to Utah." App. at 247. The district court acknowledged "[i]t [was] undisputed that PureHealth stores physical address information for newsletter recipients and thereby constructively knows that some of the emails are going to Utah residents." App. at 247. But the purposeful-direction prong remained unsatisfied, the district court reasoned, because the Utah recipients had "opted into receiving PureHealth newsletter emails." App. at 247. On appeal, XMission contends the district court mistakenly focused its purposeful-direction inquiry on the customers' opt-in conduct, rather than on PureHealth's conduct of knowingly sending the newsletter emails to XMission's customers in Utah. We agree with XMission.

Jurisdictional discovery confirmed PureHealth maintains a database of customer information for recipients of newsletter emails that ties a customer's email address to a physical address and an IP address. This undisputed fact—that PureHealth knew its newsletter emails were going directly to Utah residents—is fatal to its appellate position on purposeful direction. *See id.* at 844–45.

*Fluent* is instructive by contrast. There, XMission sued Fluent LLC, a Delaware company, in federal district court in Utah for violating the CAN-SPAM Act. *Id.* at 837. Fluent was in the digital marketing business. *Id.*

16

XMission claimed Fluent sent thousands of marketing emails to customers in Utah through XMission's servers. *Id.* The offending emails prompted recipients to enter personal information, which Fluent would then sell to businesses "to assist them in developing targeted marketing campaigns." *Id.*

Fluent moved to dismiss for lack of personal jurisdiction. *Id.* at 839. According to Fluent, it did not send the offending emails itself but relied on third parties. *Id.* at 837–38. Fluent maintained it had "no involvement with or control over the origination, approval, or delivery of the emails." *Id.* at 838. And it "never undert[ook] to market or advertise in Utah or to target or direct any internet marketing directly to Utah residents." *Id.* Fluent claimed it did not "know the locations of the recipients [or] decide who should receive the emails." *Id.* The district court granted Fluent's motion to dismiss, and we affirmed. *Id.* at 839.

We first acknowledged the focus of the purposeful-direction inquiry must be on the defendant's contact with the forum state. *Id.* at 843. And in cases involving "Internet activities such as mass emailing, website hosting, and Internet postings," we must ask "whether the defendant 'deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state.'" *Id.* at 844–45 (quoting *Shrader*, 633 F.3d at 1241).

"[S]pecific jurisdiction is proper over a[n] [email] sender," we held in *Fluent*, "*only* if the plaintiff shows that the sender had knowledge that the offending emails were going to a specific State." *Id.* at 845 (emphasis added). Applying this rule, we concluded "XMission ha[d] not made any showing that Fluent *knew* that any email recipient resided in Utah." *Id.* at 846. XMission "presented no specific evidence contradicting" Fluent's explanation of its "involvement with the emails," we reasoned, and "offered no evidence that Fluent itself delivered emails, had a business relationship with Utah publishers, or knew that any publishers were sending emails to Utahns." *Id.* at 838.[11] Though XMission insisted "Fluent must have known some of the offending emails were going to Utah . . . based on its business model," we rejected this argument, explaining "[p]urposeful direction cannot be satisfied if the [defendant] . . . simply wants as many responses as possible but is indifferent to the physical location of the responder." *Id.* at 846–47.

In this appeal, XMission acknowledges "emailing someone who happens to live in Utah—without knowledge of where they live—is not enough to subject a company to personal jurisdiction." Reply Br. at 8. That is precisely

---

[11] In *Fluent*, we observed XMission "could have obtained through discovery some additional information to support jurisdiction; but it conducted no jurisdictional discovery." *Fluent LLC*, 955 F.3d at 836. Here, by contrast, XMission conducted jurisdictional discovery to aid in satisfying its *prima facie* burden.

the import of *Fluent*. But that is not this case. PureHealth admits it sent newsletter emails to its former customers in Utah knowing they live in Utah. And that knowledge—absent in *Fluent* but undisputedly present here—shows PureHealth expressly aimed its conduct at Utah. *See id.* at 846 (PureHealth admits it "*knew* that [the] email recipient[s] resided in Utah"); *see also* App. at 247 ("It is undisputed that PureHealth . . . knows that some of these emails are going to Utah residents.").

That PureHealth's former Utah customers may have consented to receiving the newsletter emails from PureHealth does not disturb our conclusion. "The primary focus of our personal jurisdiction inquiry is the defendant's relationship to the forum State." *Bristol-Myers Squibb Co.*, 582 U.S. at 262. It is axiomatic that "jurisdiction must be based on the conduct of *the defendant* itself" and not on "the unilateral activity of another party or a third person." *Fluent LLC*, 955 F.3d at 847 (emphasis added) (citation omitted); *see also Asahi Metal Indus. Co., Ltd.*, 480 U.S. at 109 (explaining "[j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum state" and that the minimum contacts "must have a basis in 'some act *by which the defendant* purposefully avails itself of the privilege of conducting activities within the forum State'" (second emphasis added) (quoting *Burger King Corp.*, 471 U.S. at 475)); *Walden*, 571 U.S. at 285

19

(explaining "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him"). The proper focus of the purposeful-direction inquiry is thus on PureHealth's conduct in Utah and not the conduct of the email recipients who reside in the state.[12]

We turn now to the final requirement of the harmful-effects test—the defendant's "knowledge that the brunt of the injury would be felt in the forum state." *Newsome* v. *Gallacher*, 722 F.3d 1257, 1269 (10th Cir. 2013). This element "concentrates on the consequences of the defendant's actions—where was the alleged harm actually felt by the plaintiff." *Dudnikov*, 514 F.3d at 1075. We have little trouble concluding XMission has made a sufficient showing at the pleading stage.

XMission argues "[b]y knowingly sending emails to Utah residents on Utah servers, PureHealth has knowingly inflicted harm on a Utah business." Aplt. Br. at 27. We agree. We previously have suggested that by satisfying the "first two prongs" of the harmful-effects test—an *intentional action expressly aimed* at the forum state—a plaintiff would show the defendant knew the

---

[12] PureHealth insists the purposeful-direction requirement is not met because the newsletter emails were "aimed at customers, not Utah." Aplee. Br. at 22. "That the customer was in Utah is happenstance," PureHealth argues, "and not th[e] intentional conduct the harmful effects test demands." Aplee. Br. at 22. We are not persuaded because, as explained, this argument misunderstands the law.

"effects would be felt in" the forum. *Dudnikov*, 514 F.3d at 1077; *see also Newsome*, 722 F.3d at 1269 (reasoning "[a]t the pleading phase, then, it is a fair inference that the . . . defendant[] knew that the brunt of an injury to [the plaintiff] would be felt in [the forum State]" once the first two prongs of the harmful-effects test are met). Moreover, the record shows the entirety of XMission's infrastructure was in Utah, including its email servers. XMission alleged it incurred costs maintaining its servers and upgrading them to handle the influx of emails from PureHeath. It further asserted it suffered "harm to [its] reputation" and received "customer and email recipient complaints . . . of unwanted spam arising from the email at issue." App. at 15.

We thus conclude XMission has made a *prima facie* showing that, by knowingly sending newsletter emails to customers residing in Utah, PureHealth purposefully directed its conduct at the forum state.

**B**

We turn next to whether XMission's claims "arise out of or relate to" PureHealth's forum conduct. *See Burger King Corp.*, 471 U.S. at 472. The district court determined, even "if PureHealth's newsletter emails were sufficient to establish purposeful direction," XMission did not "allege[] facts . . . support[ing]" that those emails "caused or are related to its causes of action." App. 247. The district court faulted XMission for "conclusively claim[ing] that the subject headings were false or misleading" but "not

21

provid[ing] any specific factual allegations or evidence to support this claim." App. at 247–48. On appeal, XMission contends it presented sufficient allegations and evidence to show a link between the litigation and PureHealth's conduct in Utah. Again, we agree with XMission.

"Step two of the minimum contacts test requires us to determine whether the plaintiff's injuries 'arise out of' the defendant's forum-related activities." *Old Republic Ins. Co.*, 877 F.3d at 908. "The arising-out-of component of the test requires courts to ensure that there is an adequate link between the forum State and the claims at issue, regardless of the extent of a defendant's other activities connected to the forum." *Fluent LLC*, 955 F.3d at 840. "In order for a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State." *Old Republic Ins. Co.*, 877 F.3d at 908 (internal quotations omitted) (quoting *Bristol-Myers Squibb Co.*, 582 U.S. at 264).

We have interpreted the "arise out of" language to require "some sort of causal connection between a defendant's contacts and the suit at issue." *Dudnikov*, 514 F.3d at 1078; *see also Hood* v. *American Auto Care, LLC*, 21 F.4th 1216, 1223 (10th Cir. 2021) (recognizing "the Supreme Court agreed that 'arise out of' is a causal test"). And in this context, we have used

"but-for and proximate causation tests." *Id.* at 1079. As we explain, XMission satisfies both.[13]

Proximate causation "calls for courts to 'examine whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim.'" *Dudnikov,* 514 F.3d at 1078 (quoting *O'Connor* v. *Sandy Lane Hotel Co.*, 496 F.3d 312, 319 (3d Cir. 2007) (alteration omitted)). "[T]he test for proximate causation for purposes of personal jurisdiction may be, in appropriate circumstances, somewhat looser than the tort concept of

---

[13] We have observed that our court has not settled on a specific standard of causation for the purposeful-availment inquiry. *Compañía de Inversiones Mercantiles, S.A.* v. *Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1285 (10th Cir. 2020) ("This court on several occasions has declined to choose between but-for and proximate causation [in the personal jurisdiction context], finding that neither test was outcome determinative given the facts at hand."). And we need not do so in this case. For one thing, neither test is outcome determinative, because, as we explain, XMission satisfies both of our circuit's articulated formulations.

And there is reason to think a wholly causation-based framing of the "arise out of or relate to" prong may be in tension with the Supreme Court's recent pronouncements on the specific-jurisdiction inquiry. *See, e.g., Ford Motor Co.*, 592 U.S. 351 at 362 (explaining "we have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct"); *see also Bristol-Myers Squibb Co.*, 582 U.S. at 262 (explaining specific jurisdiction requires only an "affiliation between the forum and underlying controversy" such that the court is adjudicating "issues deriv[ed] from, *or connected with*" the controversy (emphasis added) (quoting *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919)); *Hood*, 21 F.4th at 1223–25 (explaining *Ford Motor Co.* "did not support requiring strict causation" in evaluating the "arise out of or relate to" prong of specific jurisdiction).

proximate causation." *Compañía de Inversiones Mercantiles, S.A.* v. *Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1288 (10th Cir. 2020). Under the proximate-cause test, we must "determine whether a nexus exists" between a defendant's forum contacts and a plaintiff's cause of action. *See id.* at 1285 (10th Cir. 2020) (citation omitted). Applying the proximate-cause test, PureHealth's newsletter emails—its conduct in Utah—are linked to XMission's claims.

Recall, the CAN-SPAM Act prohibits the use of deceptive subject headings, "likely to mislead a recipient . . . about a material fact regarding the contents or subject matter of the message." 15 U.S.C. § 7704(a)(2). XMission alleged the newsletter emails violated the CAN-SPAM Act by including false and misleading subject lines.[14] The newsletter emails allegedly "contain a subject heading that [states] that the promoted products have healing properties" unsupported by "any data, documentation, or substantiation." App. at 19, ¶¶ 55–56. According to XMission, the subject lines "are designed merely to induce the recipient to open the email under false pretenses." App. at 19, ¶ 56. XMission also included examples of the newsletter emails with their subject lines.

---

[14] Likewise, Mr. Ashdown, in his declaration, stated XMission discovered 655 emails "sent directly from Pure Health" that "include[d] subject lines that . . . are false and misleading in violation of the CAN-SPAM Act." App. at 223.

PureHealth's newsletter emails squarely form the basis of XMission's claims under the CAN-SPAM Act. *See Bristol-Myers Squibb Co.*, 582 U.S. at 262 (explaining "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction" (quoting *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919)).

Under the but-for-cause formulation, "any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction." *Dudnikov*, 514 F.3d at 1078. At this stage, the 655 newsletter emails are at minimum an "event in the causal chain leading to [XMission's] injury." *Id.* Stated differently, but for PureHealth's act of knowingly sending newsletter emails directly to XMission's Utah customers, XMission would not have a cause of action under the CAN-SPAM Act for the allegedly false and misleading subject lines in those emails.

Resisting this conclusion, PureHealth maintains "nothing shows that the [newsletter] emails with purportedly misleading subject lines are linked to XMission's alleged injuries." Aplee. Br. at 34. It characterizes XMission's allegations as "bald assertion[s]" without "sufficient facts." Aplee. Br. at

25

35.[15] We are not persuaded. PureHealth's argument depends on a level of particularity at the pleading stage that our law does not require. To be sure, XMission bears the burden of establishing personal jurisdiction because the matter is contested. But the plaintiff "need only make a *prima facie* showing" of personal jurisdiction. *Dudnikov*, 514 F.3d at 1070. And "[i]n the preliminary stages of litigation, . . . the plaintiff's burden is light." *Wenz* v. *Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995); *see also* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1342 (4th ed. 2024) ("The objective of Federal Rule of Civil Procedure 12 is to expedite and simplify the pretrial phase of federal litigation while at the same time promoting the just disposition of civil cases.").

Here, XMission has made a *prima facie* showing that its injuries arose out of or related to PureHealth's newsletter emails. The complaint detailed how PureHealth's emails were sent to XMission's Utah customers, causing those emails to reside on XMission's Utah servers. And XMission alleged it received customer complaints that damaged its goodwill and reputation and forced it to spend money on its servers it otherwise would not have spent.

---

[15] PureHealth also argues XMission failed to allege sufficiently the elements of a claim under the CAN-SPAM Act. That argument is inapposite to the specific jurisdiction question at the heart of this appeal. *Compañía de Inversiones Mercantiles, S.A.*, 970 F.3d at 1286 (explaining "personal jurisdiction turns on due process principles, rather than the elements of a given claim").

Those allegations are sufficient to establish XMission's injuries arise out of

PureHealth's newsletter emails.[16]

---

[16] Of course, the exercise of jurisdiction must be reasonable under the circumstances. *Burger King Corp.*, 471 U.S. at 477 (listing the factors to consider in determining "the reasonableness of jurisdiction"); *Asahi Metal Indus. Co.*, 480 U.S. at 113 (stating "the determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors"). PureHealth insists on appeal that it would be unreasonable for a federal district court in Utah to adjudicate this lawsuit. Though PureHealth asserted unreasonableness in the district court, the argument was not developed, and the district court never passed on the issue. Indeed, PureHealth devoted less than a paragraph to its reasonableness argument in its motion to dismiss before the district court and abandoned the issue entirely in its reply to XMission's opposition.

We have explained "it is incumbent *on defendants* to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Shrader*, 633 F.3d at 1240 (emphasis added) (quoting *Dudnikov*, 514 F.3d at 1080); *see also Burger King Corp.*, 471 U.S. at 477 (explaining a defendant "must present a compelling case" for why the exercise of jurisdiction is unreasonable); *Carmona* v. *Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019) (explaining "the burden shifts to the defendant to make a 'compelling case' that the assertion of jurisdiction is not fair or reasonable"); *Polar Electro Oy* v. *Suunto Oy*, 829 F.3d 1343, 1348 (Fed. Cir. 2016) (same); *Louis Vuitton Malletier, S.A.* v. *Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (same); *Schwarzenegger* v. *Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (same). PureHealth failed to carry its burden in the district court. Under these circumstances, we decline to exercise our discretion to consider the issue in the first instance. *See Cavic* v. *Pioneer Astro Indus., Inc.*, 825 F.2d 1421, 1425 (10th Cir. 1987) (reasoning "a federal appellate court will not consider an issue 'which was not presented to . . . the trial court'" (quoting *Eureka-Carlisle Co.* v. *Rottman*, 398 F.2d 1015, 1019 (10th Cir. 1968)); *see also id.* ("Further, '[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.'" (quoting *Singleton* v. *Wulff*, 428 U.S. 106, 121 (1976)).

**IV**

The district court's grant of PureHealth's Motion to Dismiss is **REVERSED**. We **REMAND** for further proceedings consistent with this opinion.